GENE PIERRE HOPKINS *v.* STATE OF MARYLAND

[No. 297, September Term, 1974.]

*Decided December 19, 1974.*

---

17. Given my view, the question of the sufficiency of the evidence would not be reached.

54

The cause was argued before ORTH, C. J., and GILBERT and LOWE, JJ.

*Durke G. Thompson, Assigned Public Defender,* for appellant.

*Leroy Handwerger, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County, Reginald W. Bours, III, Deputy State's Attorney for Montgomery County, J. James McKenna* and *William T. Wood, Assistant State's Attorneys for Montgomery County,* on the brief, for appellee.

GILBERT, J., delivered the opinion of the Court.

Gene Pierre Hopkins was indicted by the grand jury for Montgomery County on charges of murder, assault with intent to murder, assault with intent to maim, assault and battery, assault and carrying a dangerous weapon. The indictment grew out of a racially based escapade by three young white men who, for a "lark", decided on the night of August 18, 1972 to "raise a little hell" with the black people who lived in the Ken-Gar area of Montgomery County. As the three youths drove along Plyers Mill Road they threw firecrackers at the people they saw. The vehicle in which the youths were riding was driven by Mark Stephen Murray who was eighteen years old. According to the testimony of one of the youths, the perverted form of entertainment decided upon by the three young men was Murray's idea. After the firecrackers were hurled at various pedestrians and bystanders, the vehicle continued on Plyers Mill Road to what proved to be a cul-de-sac. There the three observed that they were being approached by a group of black men. One of the trio fled afoot, the other two, including Murray, remained in the vehicle. When the group of black men surrounded the vehicle they told the two remaining white youths to get out of the car. Murray responded with the question, "Can't we talk this over?" One of the group of black persons possessed a gun and discharged the gun three times in a downward motion into the ground. Either ricochets or gravel came in contact with the underside of the motor vehicle. Instead of alighting from the car, Murray began to drive the car forward and the person with the gun fired twice. The vehicle ground to a halt, and Murray exclaimed that he had been hit. He slumped forward over the wheel. The other white youth got out of the car and was beaten about his head and body. Murray died as a result of a gunshot wound that entered his back, punctured both lungs and his aorta vein. The youth who was beaten by the group of black men positively identified the appellant, Hopkins, as the person who discharged the firearm into the ground. As a result of a search and seizure warrant, a .25 caliber pistol

was recovered from the residence of Hopkins, and that weapon was positively identified by a ballistics expert as the weapon from which the fatal projectile was fired. The jury convicted Hopkins of manslaughter, assault and wearing or carrying a handgun.

Prior to trial Hopkins moved for a dismissal of his indictment on the ground that "the Grand Jury was not an impartial body, in violation of the due process and equal protection clauses of the Fourteenth Amendment of the United States Constitution, and of Article 23 of the Maryland Declaration of Rights, for the reason that a Montgomery County police officer was a member of the Grand Jury."

At the hearing before the three-judge panel, on November 16, 1972, Matthew Hyatt, a Montgomery County police officer, testified that he had been summoned as a grand juror for Montgomery County, and that when he appeared before the jury judge he stated that he "didn't think that . . . [he] would be able to serve and observe in an unbiased manner." He stated that he knew most of the police officers who would appear before the grand jury panel, and that in his view when an arrest was made he felt that that in itself was sufficient to warrant an indictment. The officer acknowledged that from time to time his advice was sought by members of the grand jury, and that on at least one occasion,[1] his vote had been the crucial one. The officer further said that he believed it was impossible for him to serve as a police officer six days a week and be an impartial member of the grand jury on the seventh day. He opined that he lived in dread of making a felony arrest and then having to appear as a State witness before the self-same grand jury of which he was member. This latter eventuality did not occur, however. Officer Hyatt also told the panel that there were occasions when his "right to express" himself "might have been a factor involving persuading other people

---

1. The particular occasion was not specifically identified because of the secrecy of the grand jury proceedings.

to change their vote" for indictment.[2] Officer Hyatt was asked: ". . . [W]ould it be fair to say that in every case that came before that grand jury, that you evaluated the testimony of each and every witness honestly and fairly and as completely as you could pursuant to your oath as a grand juror? " Mr. Hyatt responded: "I did serve as best I could under the oath of being a grand juror."

When the jury judge was called to testify he told the panel of judges that he remembered Officer Hyatt because Hyatt had initially returned the grand jury questionnaire unanswered with the notation "across the top . . . that he was a police officer and that he wasn't subject to grand jury service." The officer was instructed as a result of the jury judge's phone call to the police officer to send a completed jury questionnaire. Thereafter according to the judge's "only clear recollection", Officer Hyatt stated that service on the grand jury would require him "to give up his day off each week." Jury service, he said, "would deprive him of accompanying his wife on shopping trips and doing other errands", and that such service "would be very inconvenient to him and a hardship upon him." The judge said that he had "no independent recollection" of any reference to "bias on

---

2. The officer was asked by one of the judges of the panel why he took the oath that was given to the grand jury. Officer Hyatt responded that he felt compelled to take the oath in view of the jury judge's refusal to dismiss him from grand jury service. He stated, "What other choice did I have? "

The following occurred:

"[The judge]: Officer, I would say the choice you would have had was to stand up to your full height and say, 'Go to hell. I can't serve.'

The witness: As I remember, I almost did.

[The judge]: We are not going to have an America if you people and the rest of you don't start doing that."

Perhaps the officer was more cognizant of the jury judge's summary contempt power than the jury judge's colleague. *See* State v. Roll, 267 Md. 714, 298 A. 2d 867 (1973); Thomas v. State, 21 Md. App. 572, 320 A. 2d 538 (1974), *cert. denied* by the Court of Appeals, September 11, 1974; Meyers v. State, 23 Md. App. 275, 326 A. 2d 773. We cannot help but observe that we may not "have an America" if everyone decides to take the law into his own hands and judges advocate, from the bench, disrespect for law. In short, the judge was wrong. He would have done well to remember the words of J. Locke, *Second Treatise of Government,* § 57 (1690), where it is written:

"The end of law is not to abolish or to restrain, but to preserve and enlarge freedom; for in all the states of created beings capable of laws, where there is no law, there is no freedom."

58

account of [Hyatt's] employment." The judge also testified that he was "unconvinced that [Hyatt] would not be able to render impartial service." There was testimony that two other law enforcement officers had been excused from the grand jury because their excuses were found to be "credible". The record reveals the following questions put to the jury judge and his answers thereto:

"Q. He was qualified to be a grand juror by the fact that you didn't think he was a truthful person; is that it?

A. I thought he was emotionally upset and he wasn't presenting a credible story as to why he should be excused.

Q. But this was at least his second or third attempt to be excused; right?

A. Well, his first attempt was to not fill out the questionnaire, and he cited in his questionnaire respondent filled out that he was a police officer and he wasn't supposed to serve on a jury.

Q. Did any information come to you after he served, after he was sworn, that he still wanted to get off, that at this time he wanted to get off the grand jury?

A. I don't recall any request made during the jury service.

Q. Do you know if your office received any letters from him or an attorney who represented him, or telephone calls from an attorney who represented him?

A. I don't recall any. My secretary would have the letters, if they were received.

Q. Did you receive any letters or requests from any of his superior officers in the Police Department?

A. Any requests that he be excused?

Q. Yes.

A. None whatever."

The three judge panel, on December 22, 1972, denied the appellant's motion to dismiss the indictment.[3]

On appeal to this Court appellant attacks the ruling of the three judge panel. He argues that the Due Process Clause of the Constitution of the United States "protects a defendant from jurors who are actually incapable of rendering an impartial verdict based on the evidence and the law." Further, he asserts that "the U.S. Supreme Court has held that a State may not subject a defendant to indictment and trial by grand and petit juries that are plainly illegal in their composition." In support of his contention appellant cites *Jordan v. Massachusetts*, 225 U. S. 167, 32 S. Ct. 651, 56 L. Ed. 1038 (1912); *Moore v. Dempsey*, 261 U. S. 86, 43 S. Ct. 265, 67 L. Ed. 543 (1923) and *Peters v. Kiff*, 407 U. S. 493, 92 S. Ct. 2163, 33 L.Ed.2d 83 (1972). We think appellant misreads *Jordan, Moore* and *Peters*, and then misapplies them to the instant case.

*Jordan* dealt with a member of the petit jury who was insane. *Moore* was concerned with a petit jury's being intimidated by "threat of mob violence." *Peters* involved a Caucasian's challenge to the systematic governmental exclusion of black persons from both the grand and petit juries. Clearly, *Jordan* and *Moore* are inapposite and need no discussion. *Peters* does not stand for the proposition that in order for an indictment to be valid the grand jury must be free of bias. Mr. Justice Marshall, writing for the plurality, opined at 501:

> ". . . [I]f a State chooses, quite apart from constitutional compulsion, to use a grand or petit jury, due process imposes limitations on the composition of that jury.

---

3. The Motion to Dismiss was joined into by twenty-four other accuseds, but their cases are not before us. The motion contained other grounds for dismissal. The other grounds are not raised in this appeal. We have previously considered the issues, however, in other cases, and we have decided them adversely to the position taken by the twenty-five accused. *See* Wilkins v. State, 16 Md. App. 587, 300 A. 2d 411 (1973); *aff'd*. Wilkins v. State, 270 Md. 62, 310 A. 2d 39 (1973); Hopkins v. State, 19 Md. App. 414, 311 A. 2d 483 (1973), *cert. denied* Court of Appeals, March 18, 1974.

Long before this Court held that the Constitution imposes the requirement of jury trial on the States, it was well established that the Due Process Clause protects a defendant from jurors who are actually incapable of rendering an impartial verdict, based on the evidence and the law."

In our view, *Peters v. Kiff, supra,* does not modify the holding of the Supreme Court in *Beck v. Washington,* 369 U. S. 541, 82 S. Ct. 955, 8 L.Ed.2d 98 (1962). In that case the Court upheld the State of Washington's high Court's affirmation of Beck's conviction. Beck had argued that the grand jury was biased because of adverse magazine and newspaper publicity in which Beck's guilt was accepted as having been established as fact. The Supreme Court said that there had been no showing of actual prejudice. It went on, however, to state flatly that it did not "remotely intimate any view" on whether an accused is entitled under the Due Process Clause to an unbiased grand jury.

Appellant's reading of *Peters v. Kiff, supra,* appears to be overly broad. Patently a grand jury does not "render a verdict", but merely determines from the one-sided presentation of facts whether there is sufficient proof before it upon which to bring a charge. It is the trier of fact, the petit jury, that hands in a verdict. Had the Supreme Court intended to depart from its decision in *Beck, supra,* and intimate its view, it would, in our opinion, have done so. Significantly, the Supreme Court did not deviate from the course it chose in *Beck.*

Although historians disagree as to the origin of the grand jury,[4] G. Edwards *The Grand Jury* 2 (1906) states:

"Strictly speaking there is no obscurity surrounding the origin of the 'grand jury', for it was not until the 42nd year of the reign of Edward III (A.D. 1368) that the modern practice of returning a panel of twenty-four men to inquire for

---

4. W. Shakespeare, *Twelfth Night,* III, ii (c. 1600) states there "have been grand-jurymen since before Noah was a sailor."

the county was established and this body then received the name of *'le graunde inquest'*."

The Englishmen who first settled in the colonies brought with them "all the civil rights which they enjoyed in their native land, and with them came the grand jury." *Id.* at 31. The Constitution of the United States, as originally adopted,[5] contained no provision guaranteeing a presentment or indictment by a grand jury. The omission was corrected by the ratification of the Fifth Amendment, December 15, 1791.[6] The Fifth Amendment provides in pertinent part:

"No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger, . . ."

The above-quoted portion of the Fifth Amendment has not been held to be applicable to the several States, *Peters v. Kiff, supra, Hurtado v. California,* 110 U. S. 516, 4 S. Ct. 111, 28 L. Ed. 232 (1884), although it is indubitably binding upon the Federal Government.[7]

---

5. The Constitution was submitted to the several States by the Constitutional Convention on September 17, 1787. It became operative on March 4, 1789 by virtue of its ratification by the Constitutional Conventions of nine of the original thirteen States. Maryland was the seventh State to ratify the Constitution. It took that action on April 28, 1788.

6. The first ten amendments to the Constitution were proposed by the Congress, September 25, 1789.

7. We note that Chief Judge Robert C. Murphy, in his Report on the State of the Judiciary to the Legislature of Maryland on January 31, 1973, said:

"One needless source of considerable delay . . . between apprehension and trial of guilty felons, is the long-standing requirement of our common law, now codified as part of our criminal code, that, in all felony cases, absent waiver, no prosecution may begin unless and until the accused is indicted by a grand jury. *Nothing in either the Maryland or Federal Constitutions requires grand jury indictment as a prerequisite to formally charge persons with the commission of felonies in State courts;* indeed, most of the states have abolished any such rigid

The grand jury system has been both praised and damned. There are those who view the grand jury as the "security of Englishmen's lives",[8] "the grand bulwark of his liberties",[9] and "the noblest check upon the malice and oppression of individuals and states".[10] On the other hand, its critics view it as "purely mischievous",[11] a "relic of barbarism",[12] and a "rubber stamp" for prosecutors.

As Chief Judge Murphy noted in his address to the General Assembly of Maryland, n. 7, *supra,* there is nothing in the Maryland Constitution that mandates indictment by a grand jury as a prerequisite to trial. Moreover, the Legislature heeded the advice of Chief Judge Murphy and conferred upon State's Attorneys a qualified right to elect to proceed against an accused either by way of indictment or information. Md. Ann. Code art. 27, § 592.[13]

The Court of Appeals and this Court have stated that a grand jury is:

" . . . [A]n inquisitional and accusatory body. It does not determine the guilt or innocence of the accused as that decision is vested in the petit jury or court, if there be a non-jury trial."

---

requirement; and 1 suggest to you that Maryland, in the interest of creating a more effective criminal justice system, permit prosecutors to file complaints against accused felons by way of informations, as they are now permitted to do in misdemeanor cases, rather than be compelled in all felony cases to obtain a grand jury indictment as the one and only permissible charging device. I do not suggest abolition of the grand jury; I would preserve the institution, but make it more responsive to the needs of the public by utilizing it, not as it is presently primarily utilized — to screen cases about which the grand jurors have absolutely no information other than what the State's Attorney and police present to them, but instead to concentrate its energies on its historical investigatory function, considering matters of real importance where no prior arrest has occurred, such as cases involving allegations of public corruption. . . ." (Emphasis supplied).

8. J. Somers, *The Security of Englishmen's Lives, etc.,* (1694).

9. 4 W. Blackstone, *Commentaries* \*349.

10. G. Edwards *The Grand Jury, supra* at 1.

11. 2 J. Bentham, *Rationale of Judicial Evidence* 312 (1827).

12. Spencer v. Wilson, 29 L.T. 21, 24 (1873).

13. This section took effect July 1, 1973. It was not operative at the time of the indictment in the instant case.

*Hopkins v. State, supra. See also Coblentz v. State,* 164 Md. 558, 166 A. 45, 88 A.L.R. 886 (1933). In *Coblentz* the Court of Appeals considered a case wherein the president of a bank was charged with accepting deposits even though he knew that his bank was insolvent. The Court, speaking through Chief Judge Bond said at 570:

"A second objection advanced in the plea was that nine members of the grand jury were disqualified from serving in the investigation and from finding this particular indictment because they had been subject to losses as depositors in the Central Trust Company, or in other depositaries which had been merged with that company, and were embittered against the defendant; and because the foreman, one of those depositors, had publicly declared his hostility to the defendant and charged him with fraud. This objection we find insufficient to support the plea. The grand jury, as has been observed, is not a judicial body; it is an accusing body, permitted to act upon knowledge obtained by its members from any source. Under the requirements of the statute law of the state, Code, art. 51, secs. 7 to 10, they are chosen with judgment and discretion with reference to their intelligence, sobriety, and integrity; and they are sworn to present no person for envy, hatred, malice, or ill will. But there are no statutory provisions in Maryland, as there are in some other states, prescribing additional cautions or qualifications, and we find no ground for imposing a requirement that they must be unprejudiced, as the objection demands. On the contrary, such a requirement would seem inconsistent with their freedom to accuse upon their own knowledge, for persons who come with knowledge sufficient to serve as a basis of indictment are likely to come with the conclusion and prejudice to which that knowledge leads. They must act upon their own

> convictions, after conferring secretly and without any interference; but they are not required to come without any prejudice."

It has been held that a person is not disqualified to serve as a grand juror on the ground that: (a) he was the prosecutor of the case, *U. S. v. Williams*, 28 F. Cas. 666 (No. 16,716) (C.C.D. Minn. 1871); (b) he was a relative of the person the accused was alleged to have injured, *Collins v. State*, 3 Ala. App. 64, 58 So. 80 (1912); (c) the complaining witness, *Holmes v. State*, 160 Ark. 218, 254 S. W. 470 (1923); (d) the son-in-law of the murder victim, *Oglesby v. State*, 83 Fla. 123, 90 So. 825 (1922); (e) the father of a rape case prosecutrix, *Zell v. State*, 15 Ohio App. 446, 32 Ohio C. A. 385 (1922); (f) the committing magistrate, *State v. Chairs*, 9 Baxt. (Tenn.) 196 (1877); (g) a member of a petit jury before whom perjury was alleged to have been committed, *State v. Wilcox*, 104 N. C. 847, 10 S. E. 453 (1889); (h) a special police officer, *Commonwealth v. Hayden*, 163 Mass. 453 (1895); (i) a member of an organization the object of which was to detect crime, *Musick v. The People*, 40 Ill. 268 (1866); (j) that he had previously issued a warrant for and expressed an opinion as to the guilt of the accused, *United States v. Belvin*, 46 F. 381 (1891); (k) a deputy sheriff, *Owens v. The State*, 25 Tex. App. 552 (1888).[14]

*Note*, 111 U. Pa. L. Rev. 1000, 1001-02 (1963) discussed the reason that the general rule as to impartiality of grand juries has not been superseded by the Supreme Court in its

---

**14.** *See* cases collected in Annot., "Prejudice of member of grand jury against defendant as ground of attack on indictment," 88 A.L.R. 899 (1934), which states that "The general rule is that bias or prejudice of a member of the grand jury is not ground for an attack on the indictment. Many cases are to this effect, usually proceeding on the theory that a grand jury is an accusatory and not a judicial body, and has the right and obligation to act on its own information, however acquired." 88 A.L.R. at 900. *See also* 38 Am. Jur. 2d, *Grand Jury*, § 7 (1968) which declares "Generally in the absence of a controlling statutory provision, a person is not disqualified or incompetent to serve as a grand juror by reason of bias or prejudice on his part, by the fact that he has heard or read about the case under investigation or has even formed or expressed an opinion as to the guilt of the accused, or by his interest in a prosecution other than a direct pecuniary interest." (Footnotes omitted).

recent grand jury racial discrimination cases. The author stated:

"The asserted right [by *Beck*] to an unprejudiced grand jury was based primarily upon the Court's statement in *Cassell v. Texas* [339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950)]: 'Review was sought in this case to determine whether there had been a violation by Texas of petitioner's federal constitutional right to a fair and impartial grand jury.' "

*Cassell* marked the culmination of the development, in a long line of racial discrimination cases, of a rule that 'a Negro is denied the equal protection of the laws when he is indicted by a grand jury from which Negroes as a race have been intentionally excluded.' This principle is not applicable by analogy to the 'impartiality' question in the instant case. Systematic discrimination against the race is the sole issue in the Negro cases, and there is no inquiry as to the state of mind of the grand jurors concerning the defendant. Mr. Justice Douglas' interpretation of *Cassell* as insuring impartiality towards the defendant overlooks the fact that it is the manner of selection — as opposed to the mental attitude of those selected — that violates the equal protection rule enunciated in *Cassell*. Exclusion of Negroes from the panels is not indicative of the mental attitude of the white persons actually selected, and the Court has never held that a defendant has a vested right to representation of his race.

The majority opinion expressly disclaimed any intimation on whether due process requires impartiality vis-a-vis the defendant, but did cite dicta in three recent cases [15] to show that a

---

15. The three cases cited were Lawn v. United States, 355 U. S. 339, 349-350, 78 S. Ct. 311, 2 L.Ed.2d 321 (1950); Costello v. United States, 350 U. S. 359, 363, 76 S. Ct. 406, 100 L. Ed. 397 (1956); Hoffman v. United States, 341 U. S. 479, 485, 71 S. Ct. 814, 95 L. Ed. 1118 (1951).

colorable argument to this effect might be made. But until the Court either adopts Justice Douglas' position and extends the meaning of 'impartiality' beyond protection of minority groups, or reverts to a viewpoint that has been criticized in the past half century — that the function of the grand jury is to stand between the prosecutor and the accused — , due process does not seem to require that grand jurors be completely impartial toward prospective defendants." (Footnotes omitted).

By Laws of 1969, ch. 408, the legislature repealed and reenacted Md. Ann. Code art. 51, *Juries*.[16] In doing so it eliminated all exemptions from jury service. Subsequently at the next legislative session two exemptions were added, *viz.*, "members of the organized militia duly certified as such by the military department", and those persons "seventy (70) years or older" who are exempted if they in writing so prove.[17]

We observe that then Md. Ann. Code art. 51, § 9 [18] provided that a person could be excused from jury duty,

"(ii) . . . by the court on the ground that such person may be unable to render impartial jury service or that his service as a juror would be likely to disrupt proceedings, or . . . (vi) excluded upon determination by the court that his service as a juror would be likely to threaten the secrecy of the proceedings, or otherwise adversely affect the integrity of the jury deliberations."

The quoted provisions of § 9 are by the permissive language utilized directed to the sound discretion of the court.

It is apparent from the record that the jury judge, who considered Officer Hyatt's request to be excused from jury

---

**16.** Md. Ann. Code art. 51 is now codified as Courts and Judicial Proceedings Article §§ 8-101 — 8-401 (1974).

**17.** Laws of 1970, ch. 408, now codified as Courts Art. § 8-209. In addition Courts Art. § 8-209 b imposes certain limitations not here applicable.

**18.** Now Courts Art. 8-210.

duty, believed that the officer's request was motivated by: (1) the officer's desire not to perform jury duty on his "day off", and (2) the officer's desire to be with his wife, and to go shopping with her. The fact that Officer Hyatt was a police officer did not, as we have already observed, *per se* disqualify him from grand jury duty, and Mr. Hyatt's status as a policeman did not in and of itself demonstrate bias or prejudice, nor is there anything in the record before us that shows that Mr. Hyatt's jury service disrupted those proceedings, threatened their security or adversely affected the integrity of the jury's deliberations.

Although we think the jury judge did not abuse his discretion in refusing to exclude a policeman from grand jury service, we believe the better course of action would have been to have excused the officer. We repeat, however, that there is nothing in the Constitution of the United States or the State of Maryland, nor the statutes of the State of Maryland that exempts police officers from grand or petit jury service. If such a provision is to be written, it is for the General Assembly to do so and not the Court.

We note that permitted attacks on the composition of grand juries, because of alleged prejudice or bias on the part of a grand juror or grand jurymen, would wreak havoc with the orderly administration of criminal justice, impede speedy trials and generally create a chaotic condition. Each person who had been indicted might, in an effort to have that indictment dismissed, seek to challenge the membership of the grand jury upon the hopeful ground that at least one of the grand jurors had some bias toward the accused as the result of ingrained prejudice, adverse publicity, a relationship to the victim or a witness or some other type of kindred connection with the State's charges. Needless to say, such a procedure could result in each member of the grand jury's possibly being subjected to a *voir dire* "fishing expedition" by each and every accused indicted by that grand jury. In our view the Due Process Clauses of the Constitution of the United States do not require us to substitute a chaotic condition for the orderly administration of criminal justice. Moreover, as we see it, so

long as the accused is indicted by a grand jury that is chosen without systematic exclusion of any race or creed, and the accused is afforded a right to a petit jury that he may subject to *voir dire* in order to eliminate the possibility of prejudice, the constitutional protection of due process is met.

Next, appellant asserts that the trial judge erred when he allowed into evidence irrelevant testimony that was highly prejudicial to the appellant. Richard Clarence Dorsey was jointly indicted with the appellant, but apparently he struck some sort of "bargain" with the State. Seemingly in exchange for Dorsey's testimony he was to be allowed to plead guilty to "assault" and the State would recommend imposition of a sentence of less than one year. The record reveals that when Dorsey was called as a witness the prosecutor asked him:

> "Q. When you saw me last night, what were you concerned about or were you worried about anything at all?
>
> A. At that point I was a little bit worried because

[Defense counsel]: Objection. He has answered the question.

(The Court): Overruled.

By [Assistant State's Attorney]:

Q. Why were you worried?

[Defense counsel]: I object, irrelevant.

(The Court): Overruled.

(The Witness): Well, I was worried because if I come and testified against Mr. Hopkins, that maybe some things I would say would probably help him, *but that a lot of people would get the wrong idea about the thing and probably would do something to my family instead of me.*" (Emphasis supplied).

Appellant's counsel moved for a mistrial which was

denied. Counsel then requested the court for a clarifying instruction to the jury. The court declined to give it. In this Court appellant contends that the testimony of Dorsey as to his mental state was designed to show that appellant was a violent man.

We do not see it that way. The above quoted questions posed to the witness by the State are, in our view, improper, and the objections should have been sustained on the ground of irrelevancy. Nevertheless, we do not perceive the answers to the questions to have conveyed to the jury an inference that Hopkins was a violent man. On the contrary, the witness's answer makes it pellucid that he was not referring to Hopkins, but to a "lot of people" who would misconceive the witness's motive in testifying. Although the State was patently engaged in a bootstrap operation in that they were endeavoring to elevate the witness's credibility, we cannot, on the basis of the record before us, hold that the questions were designed "to blast" Hopkins's character before it had been put in issue by him. *Cf. MacEwen v. State,* 194 Md. 492, 504, 71 A. 2d 464 (1950). In the course of a trial, and particularly a lengthy trial, errors may be committed in ruling on evidentiary matters. All errors, however, are not reversible as some are deemed, under the totality of the circumstances of the particular case, to be harmless. This is such a case. Even though the trial judge erred in overruling the objections to the above quoted questions we cannot find, in the light of the totality of the evidence, that the jury was misled or likely to have been misled by the witness's answer as to why he was worried. In actuality, Hopkins opts for a perfect trial. While ideally that lofty aim is desired, it is not required. Hopkins, as are all other accused, is entitled to receive a fair trial, not a perfect one. *Moore v. State,* 23 Md. App. 540, 329 A. 2d 48 (1974); *Burnett v. State,* 11 Md. App. 550, 275 A. 2d 176 (1971); *Shotkosky v. State,* 8 Md. App. 492, 261 A. 2d 171 (1970); *Boblits v. State,* 7 Md. App. 391, 256 A. 2d 187 (1969). *See also State v. Babb,* 258 Md. 547, 267 A. 2d 190 (1970). The Fourteenth Amendment to the Constitution of the United States commands that the several

states shall afford an accused "due process of law." Judge Morton, for this Court, in *Burnett v. State, supra,* stated that, "The sphere of [the Fourteenth] Amendment mandates that every individual accused of a crime shall receive no less than a fair and impartial trial." In our view Hopkins received the fair and impartial trial which he was constitutionally guaranteed.

Hopkins next argues that the trial judge committed reversible error when the judge interrupted the jury argument of appellant's counsel. The record reveals that defense counsel had stated to the jury:

> "Do you really think that the State of Maryland and the Montgomery County State's Attorney thinks that Dorsey is truthful? If they thought he was truthful, they would have to think he was telling the truth, that he might be wrong, but they would have to think he was telling the truth when he testified, did you hear Dorsey say that Gene Davis had bribed the police — excuse me — that the police had bribed Gene Davis with twenty-five dollars and a bottle of wine in order *to get him to give false information to them so they could get a search warrant, or words to that effect.* He used the word 'bribe.' I didn't say that." (Emphasis supplied).

Thereafter the trial judge interposed:

> "THE COURT: [Counsel], I feel compelled to present to the jury that the confusion was solely yours and not the Court's. The Court out of courtesy to you gave your instruction, . . . and on the rule of law that the jury is the judge of the law as well as the fact, the Court has permitted you to argue it to them. I gave them as a courtesy to you your instruction, and I am tired of hearing you comment on matters that are not in the evidence.
>
> Ladies and gentlemen of the jury: I also am compelled to tell you that counsel a few minutes

ago told you in relation to the testimony of Mr. Dorsey, who testified that Davis told him that the police bribed him with twenty-five dollars and a bottle of wine, [Counsel] commented to you that the police bribed him to get him to give false testimony, to perjure himself so that they could get a search warrant.

I instruct you at this stage, and I am sorry to have to interrupt counsel to do it, that there is *no such evidence that those police bribed Davis or paid him to get him to suborn perjury so they could get a search warrant.*" (Emphasis supplied).

In order to place the judge's comments upon the argument of counsel in proper perspective, we quote from pertinent portions of Dorsey's testimony.

"REDIRECT EXAMINATION (Resumed)

By [the Assistant State's Attorney]:

Q. Would you like to explain the answer to the last question?

A. Yes. The reason why I was locked up, anyway, is because two of the police had bribed Mr. Davis and gave him twenty-five dollars to tell him who was in the crowd down there the first night, the night that the incident happened.

Q. The night this happened, did you talk with the police or did the police try to talk with you?

A. Yes, sir. The police had tried to talk to me.

\* \* \*

RECROSS-EXAMINATION (Resumed)

By [Defense Counsel]:

Q. Did I understand when you mentioned Gene Davis, that was just asked you by the prosecutor, that you were expressing indignation that the police had gotten Gene Davis to talk to them and give them false

information by giving him twenty-five dollars, is that it?

[Assistant State's Attorney] I object. That is just outrageous, to characterize it that way. He said nothing of the kind, and I object to that question.

[Defense Counsel] He said they —

(The Court) I am going to overrule the objection. It is cross-examination. I think it is proper. Do you understand the question?

(The Witness) Yes, I do.

By [Defense Counsel]:

Q. And they also gave Gene Davis not only twenty-five dollars but twenty-five dollars and a bottle of wine, is that correct?

A. Yes.

(The Court) What was that answer? Yes? They not only gave him twenty-five dollars but that —

[Defense Counsel] He is testifying that the police bribed Gene Davis with twenty-five dollars.

(The Court) I know what he said. You said something. I cannot understand half of what you say.

[Defense Counsel] I'm sorry, Your Honor.

(The Court) Read me what he said.

\* \* \*

(Whereupon, the Court Reporter read back the last question.)

By [Defense Counsel]:

Q. By 'they,' you meant the police?

A. Yes.

(The Court) That is what I didn't understand, about the sneaky-pete.

By [Defense Counsel]:

Q. The point is you were angry that Mr. Davis became an informer?

A. No, I'm not angry with him.

Q. All right. Let me ask you this: Did you testify that you considered, Mr. Dorsey, when you are testifying, and when you talked to [the Assistant State's Attorney] that you were doing so for a bribe of getting a sentence not to exceed one year imprisonment and a dropping of all other charges against you? Can you answer that yes or no?

A. I did not quite understand the whole thing.

Q. Do you think that you have been bribed the way Gene Davis has been bribed, except that instead of getting twenty-five dollars and a bottle of wine, you are getting a first degree murder charge dropped against you at the top risk of one year imprisonment?

A. No, sir.

* * *

REDIRECT EXAMINATION (Resumed)

By [Assistant State's Attorney]:

Q. Mr. Dorsey, the information that Mr. Davis may have given to the police, did you hear him talking to the police?

A. Well, he had come and told me his self after two other people had called me that — early that morning and saw him in the car with the police, which I saw him, too.

Q. Okay. So you talked to Gene Davis after it happened?

A. Yes, I did.

Q. And he told you, I presume, that the police gave him twenty-five dollars and a bottle of wine?

A. Yes, that morning he did.

Q. And to you that is a bribe, is that correct?

A. I guess that is what you call it."

Nowhere in the testimony of Dorsey is there a statement

to the effect that the police had bribed Davis in order to get false information from him in order to obtain a search warrant. It is beyond question that Dorsey considered the payment of twenty-five dollars and a giving of a bottle of wine to Davis as a "bribe", but notwithstanding what he considered it, he did not say nor did he imply that the information supplied by Davis was false or that it was for the purpose of getting a search warrant. According to Dorsey the "bribe" was offered to elicit "who was in the crowd down there . . . the night that the incident happened."

This Court has on occasion commented upon the jury remarks of prosecutors. *Fryson v. State,* 17 Md. App. 320, 301 A. 2d 211 (1973); *Reidy v. State,* 8 Md. App. 169, 259 A. 2d 66 (1969); *Conway v. State,* 7 Md. App. 400, 256 A. 2d 178 (1969); *Holbrook v. State,* 6 Md. App. 265, 250 A. 2d 904 (1968).

In *Holbrook* we said:

> "Of course, the prosecutor may not make statements to the jury which exceed the limits of permissible comment. What exceeds the limits of permissible comment depends a good deal upon the facts of each case . . . . It is the duty of the prosecutor to confine himself in argument to facts in evidence, and he should not state or comment upon facts not in evidence or to state what he could have proven."

For an in-depth discussion of permissible and impermissible jury argument by prosecutors, see the comprehensive opinion of Judge O'Donnell in *Wilhelm v. State,* 272 Md. 404, 326 A. 2d 707 (1974).

While our discussions have heretofore been confined, basically, to those instances of alleged impermissible prosecutorial jury argument, what we have said applies equally to arguments of defense counsel. It is no more permissible for defense counsel to engage in improper jury argument than it is for the State's prosecutorial arm. Trial judges are under an obligation to see that the rights of the parties, both the State and the accused, are protected so that

judicial proceedings are conducted in a fair and unprejudicial manner. *Fryson v. State, supra; Little v. Duncan,* 14 Md. App. 8, 284 A. 2d 641 (1971); *Ferry v. Cicero,* 12 Md. App. 502, 280 A. 2d 37 (1971). *See also DeMay v. Carper,* 247 Md. 535, 233 A. 2d 765 (1967).

Although the appellant sees error in the judge's interruption of defense counsel's jury argument, we do not see it in the same light. It is the obligation of a trial judge to "maintain strict control over the trial", *Ferry v. Cicero, supra,* and, the judge "should have no reluctance to exercise, *sua sponte* if necessary," that duty. *Ibid.* In the instant case it is apparent that defense counsel's argument as to what Dorsey had stated exceeded the bounds of what Dorsey, in fact, said. Counsel was wrong. Dorsey did not testify that Davis gave "false information" nor did he indicate that such information was for the purpose of police obtention of a search warrant.

We think the judge acted correctly and in accordance with his duty to conduct a fair and impartial trial. *Fryson v. State, supra; Ferry v. Cicero, supra.*

*Judgments affirmed.*