# MARILYN SUSAN BARTRAM *v.* STATE OF MARYLAND

[No. 582, September Term, 1975.]

*Decided October 5, 1976.*

The cause was argued before MOYLAN, DAVIDSON and MASON, JJ.

*James P. Gillece, Jr.,* with whom were *Robert B. Barnhouse* and *Piper & Marbury* on the brief, for appellant.

*Albert Gallatin Warfield, III, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Sandra Ann O'Connor, State's Attorney for Baltimore County,* and *Wallace Kleid, Assistant State's Attorney for Baltimore County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

This appeal is the culmination of a case rent by internal tension. The appellant, Marilyn Susan Bartram, convicted by a Baltimore County jury of the second-degree murder of her husband and of a related handgun offense, was a woman rent by internal tension at least during the five years of her married life. The husband and victim, Douglas MacArthur Bartram, was a man rent by internal tension apparently throughout the whole of his twenty-eight-year life. Ironically, the masterfully thorough defense waged on behalf of the appellant is also rent by internal tension. It consisted of an imaginative and meticulously prepared defense upon the merits; it also consists, at the present level, of four claims of constitutional error. The strategically compelled defense of suicide, on the one hand, tugged compellingly in one direction. It was marked by candor, openness and full disclosure. The thrust of three of the four constitutional contentions, on the other hand, is in a diametrically opposite direction. Each line of defense has been well handled as a virtuoso performance; they simply fail to come together into a well-orchestrated whole.

Constitutionally, the appellant objects bitterly to the admission of a brief statement made by her to a policeman, in which she revealed the existence of her husband's mistress, Katherine Pope. Upon the merits, however, the appellant took the stand and over several hundred pages of testimony poured forth every sordid detail of her husband's troubled sex life, central to which was the bizarre triangular relationship between the appellant, her husband and Katherine Pope. That testimony was the indispensable

predicate for the psychiatric autopsy, without which the entire defense effort had not a prayer of success.

Constitutionally, the appellant objects to the use of Katherine Pope as a witness as "the fruit of the poisonous tree." Upon the merits, however, the appellant volunteered the life story of Katherine Pope with a week-by-week account of her intimate and regular contact over a three-year period with both the appellant and her late husband. Again, such information was essential to the only available defense upon the merits.

One wants to say to the defense, "Shorn of technicality, what do you really want? Which way would you have it? Do you really want all of the background information in this case brought out or do you not? Either position is legitimate, but choose. It ill behooves you to try to have it both ways."

Constitutionally, the appellant objects to the failure of the trial judge to instruct properly on the burden of proof with respect to an intentional but hot-blooded killing in response to legally adequate provocation. Upon the merits, however, the appellant swears that her husband's death was suicidal and that she was not the homicidal agent, either in cold blood or in hot blood.

To be sure, contradictory defenses are not impermissible in our jurisprudence. The net effect nonetheless is to reduce the constitutional arguments to the clever legalism of the debating chamber and to mute the anguished cry of outraged innocence. Even in that less emotionally charged context, however, the four constitutional issues are challenging ones. The fourth, moreover, is not at odds with the defense upon the merits. The four contentions now before us are:

1. That a statement given by the appellant to a policeman at the Baltimore County General Hospital was erroneously admitted in evidence in contravention of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966);

2. That the police only learned of the existence of Katherine Pope through a statement taken from appellant

unconstitutionally and that her use by the State as a witness, therefore, violated "the fruit of the poisonous tree" doctrine in contravention of *Wong Sun v. United States,* 371 U. S. 471, 83 S. Ct. 407, 9 L.Ed.2d 441 (1963);

3. That an erroneous instruction was given on the burden of proof with respect to manslaughter in contravention of *Mullaney v. Wilbur,* 421 U. S. 684, 95 S. Ct. 1881, 44 L.Ed.2d 508 (1975); and

4. That the grand jury process was abused when, following the nolle pros of a first indictment because of an arguable violation of *Coblentz v. State,* 164 Md. 558, 166 A. 45, the assistant state's attorney and one police witness summarized the State's case before a second grand jury.

### *The Factual Backdrop*

Before proceeding to a consideration of those issues, let us set the stage factually. On Monday morning, July 2, 1973, at approximately 8:30 a.m., Douglas Bartram died in his bed, at his apartment 2-A at 3608 Yennar Lane in Randallstown, with two gunshot wounds to the head and a third to the chest. Present when the police arrived, standing immediately outside the apartment, was the appellant wife. She was in her nightgown, was attended by a friend from the neighborhood and was in a distraught condition. She and her husband had lived alone at 3608 Yennar Lane since moving from Connecticut nine months earlier so that he could take a job as chief engineer for WFBR radio. From immediate surface appearances, the police had arrived at the scene of a suicide.

To place the later contentions in proper perspective, we will set out initially just the hard evidence of the *corpus delicti* — the *corpus delicti* of unlawful homicide or of suicide, as the case may be. We will factor out of our preliminary analysis any evidence dealing with motivation — homicidal motivation as the evidence was interpreted by the State; suicidal motivation as that same evidence was interpreted by the defense. Where did the case stand without any motivational embellishment, inculpatory or exculpatory?

With two bullets in his brain, Douglas Bartram did not die of natural causes. The hard fact of three separate shots coupled with the careful firing of one of those shots in point-blank contact with the right temple negated any credible possibility of accident. Douglas Bartram was the victim of either an intentional suicide or an intentional homicide. With no scintilla of speculation that any third person was present in the apartment at the time of death, the killing agent, ineluctably, was either the victim himself or his wife, the appellant. Against that spare backdrop of but two possibilities, we turn to the testimony of Dr. Russell Fisher, who performed the autopsy.

The chest wound was superficial and will be more fully discussed hereinafter. The two shots to the head were crucial and with respect to these, Dr. Fisher was able to establish an absolute sequence of firing. The first shot entered the skull at the right temple. The entrance wound itself established that the gun barrel was in direct contact with the skin at the time of firing. The bullet shattered the skull and moved, from right to left, across the very front of the brain, doing minor damage to two of the frontal lobes. It passed essentially in front of the brain, shattered the skull again on its way out, but did not have enough force left to get through the last layer of surface skin. This bullet caused considerable bleeding as it passed through. It destroyed the entire sinus area behind the nose and mouth and caused a considerable spilling of blood. It would have caused, furthermore, a significant spurting of blood from both of those cavities. This bullet also completely severed the optic nerve and would have caused immediate blindness. It, however, was not, and alone need not have been, fatal. We will refer to it as the temple shot.

The cheek shot followed the temple shot and produced instantaneous death. It was fired from a distance of between three and six inches from the right cheek. It went inward and upward through the mouth and tore squarely upward and rearward through the mass of the brain. There was no bleeding along its path. It could have been followed, testified Dr. Fisher,  by no more than four or five heartbeats, after

which all blood pressure would have ceased and all bleeding would have stopped. From the bleeding pattern alone, it had to follow the temple shot. Dr. Fisher testified as to the effect of this second shot:

> "Immediate disability of the patient. In fact, immediate death. This was so terminal in timing that there was hardly any blood along the track of the bullet in the brain. He was without blood pressure within seconds after this passage of this bullet."

The defense made two efforts to fit the sequence of head shots within the realm of suicidal possibility. The first was the theory that since the temple shot did not produce immediate death, the victim — bent on suicide — though now blind, might have fired off a second time into his own cheek. Dr. Fisher discounted this even as a remote possibility. The medically certain effect of the temple shot with the gun pressed against the skin would have been the explosive expansion of gases around the skull beneath the surface of the skin. The shattering concussion would have produced immediate unconsciousness. Dr. Fisher testified:

> "There are two components to a contact gunshot wound of the skull. One is not only the explosive expansion of gases but accompanying that would be a concussive effect. It would be my judgment that, certainly, this man would be rendered temporarily unconscious by the passage of a bullet through his cranial cavity, with all the smashing effects of the gases expanding in there."

Dr. Fisher elaborated on what the exploding gases do:

> "[The barrel was] tight enough that when the gun discharged the gases went in instead of going out. It wasn't a quarter of an inch or a half an inch away but in sufficiently good contact that during the in shooting everything went inside and then in due course of time, as it expanded, blew back out the entrance wound."

. Nor could the victim have lost consciousness, later regained it, have fumbled about for the gun though blinded, found it and then fired the cheek shot. In this regard, Dr. Fisher testified:

> "Without a considerable span of time between the two for him to regain consciousness and find the gun and maneuver it in some such position and, at this point, the unlikeliness of a blinded individual aiming from a distance at himself, as opposed, if he is going to try it again, putting it up there in the first place, it is just the unlikely way for this to have occurred."

There was no appreciable interval between the two shots. A neighbor, whose bedroom adjoined that of the Bartram's and was separated from it only by a thin plaster wall, was startled to hear two gunshots in quick succession followed by what sounded like a dull thud. Even the testimony of the appellant herself was that she, from her kitchen, heard two loud noises in quick succession. (In her initial, uncontested conversation with the first officer on the scene, she had said that she "heard two *or three* noises.") Dr. Fisher testified as to the duration of unconsciousness following such a concussion:

> "This would certainly be more than the effect of being hit on the chin and being knocked out in a prize fight. There is far more force expended then than one would get with a hard blow in a prize fight, so it would be my opinion that the duration would be a minute or so as an absolute minimum and maybe several minutes.
>
> . . .
>
> The concussive effect, unconsciousness which, by definition, is part of concussion, would disable him from firing the second shot for quite some time."

Dr. Fisher went on as to the severity of the concussion:

> "[I]n addition to the bullet passage itself there was fracturing across the base of the skull which, I

believe, was part and parcel of the expansile forces generated when that bullet went through or when the contact wound occurred. This frequently fractures the skull.

. . .

The fact that the skull is fractured this way is other evidence of the severity of expansile forces that went on in that head when the shot was fired, that it would indeed separate fragments of the skull fractured. This is a powerful gun."

He was probed, in cross-examination, as to how rapidly unconsciousness would set in:

"Q. You indicated that the concussive force would render the individual unconscious, you felt?

A. I think so, yes. The contact wound of this kind, yes.

Q. How soon would it render them unconscious?

A. How soon?

Q. Yes.

A. Instantly.

Q. Instantaneously?

A. As instantaneously as a knockout blow of any other kind.

Q. Do you say that it is absolutely impossible for the person to have sustained this temple shot and remain conscious for even a slight period of time?

A. This is my opinion.

Q. You even rule out the possibility of it happening?

A. Well, yes. I just can't imagine a contact gunshot wound of the force of this .38 caliber weapon not producing temporary unconsciousness.

Q. Onset, immediately?

A. Onset, immediately, yes. By concussion, associated with the impact. There is, essentially, instantaneous interruption in brain function

▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆

because the tissue is so badly jostled around, shaken up.

Q. You say, essentially instantaneous. Is that different from instantaneous?

A. No, sir.

Q. So, you are saying it is absolutely instantaneous?

A. That would be my opinion."

The second theory of possible suicide put forward by the defense accepted the rapid firing sequence, but posited that the second cheek shot could have been an unconscious but reflex action as the firing hand fell away from the temple shot. Dr. Fisher discounted this as a possibility:

"... I don't believe, after the temple shot, as the arm is falling away, he is going to be capable of pulling a trigger."

Spirited cross-examination only strengthened the testimony:

"Q. (By Mr. Barnhouse) Dr. Fisher, you indicated earlier something about a prize fighter, analogizing this to a prize fighter. Aren't there times when a prize fighter will receive a blow to the head which, in fact, knocks him out but he is sort of swinging on the way down? It does not just knock him out immediately. Doesn't that happen?

A. I suppose that if a person is swinging and is hit and is falling he is going to continue to swing, if that is what you mean. I certainly would not put that in the same context as the autory motion of pulling the trigger on this gun which takes a lot of force to pull.

Q. Well, I believe it is a straight pull, though, is it not?

A. Yes, but it is a strong pull.

Q. And, a strong man pulls a strong gun?

A. Sure.

Q. Now, Doctor, what you are saying about the

prize fighter being or already starting to swing, he would possibly continue through. What you are saying is, if I understand you correctly, that when the mind is made up and the action is underway it might carry through even after the blow. Is that right?

A. A given motion, I would think, would continue for the very reason that it is the inertia of the body, as its swinging continues, but this is entirely different from a set of events in which one, after one motion which produces a coma, then has to go through this separate and distinct motion including the firing of that gun. The time element is such that I just can't buy this."

The ballistics evidence further derogated from the speculative reflex firing. It was established that the .38 revolver in this case had an extremely heavy trigger pull. Dr. Fisher referred to it:

"Q. Dr. Fisher, you saw the poundage test conducted in the Courtroom and you heard the results of it. Could this .38 caliber Smith and Wesson with a pull as required been fired after shot number one that you have described, have been fired in a reflex manner?

A. No, I don't think so. Having fired the gun I would say no."

Additional ballistics evidence established that the trigger mechanism was defective. Instead of springing back into forward position automatically, it had to be pushed forward manually before the next shot could be fired.

On the basis of the postmortem examination of the two head wounds alone, the evidence was more than legally sufficient to support a finding, beyond a reasonable doubt, that the manner of death was homicidal rather than suicidal. Dr. Fisher was asked as to the possibility of suicide. He replied:

"It would be my opinion that the possibility of

this being suicide is exceedingly remote. I have never seen any such case."

He further defined his use of the phrase "exceedingly remote":

"It is difficult to assign percentages to things but, ordinarily, when I say something is exceedingly remote I think of it in terms of one in a thousand or one in a hundred thousand."

Dr. Fisher was asked further as to "the probability of homicide." He replied:

"Since I do not believe that this was self-inflicted I think it is highly probable that this was inflicted by another person, which makes it homicide in this set of circumstances."

He further defined his use of the phrase "highly probable":

"When I say it is highly improbable I am inclined to like the 99 and 44/100 per cent or some such figure."

The physical evidence went on to tilt even more decidedly against suicide and in favor of homicide. The third shot, the one to the chest, could not have been fired by the victim. The wound itself was superficial. It entered the chest at a shallow angle from between the nipples and traveled under the skin but outside the rib cage along the left side of the body. It exited under the left armpit and entered the mattress at precisely that point, indicating both that the body was lying on its left side with the inside of the armpit down against the mattress when the shot was fired and further that there was no significant movement of the body after that shot was fired. The end of the gun barrel had been at a distance of 18″ to 21″ from the body when the gun went off. To have shot himself, the victim would have to have lain down on his left side, taken the gun in his right hand, held it down toward his waist and up in the air as high as he could reach and then fired it by pushing the trigger away from him with his thumb. The chest shot, moreover, could not fit into any credible suicidal firing sequence.

The appellant, lest she tacitly acknowledge guilt, had to take the stand to explain that shot. She testified that she was in the kitchen preparing hot chocolate for her husband when she heard two noises that sounded like an automobile backfiring. She looked out the window and saw nothing. She finished making the hot chocolate and took it into the bedroom. She walked up beside the bed, with her husband's back toward her, and placed the hot chocolate on the nightstand. Only then did she look over and see her husband lying in a pool of blood. She walked around to the other side of the bed, toward which he was facing. She heard a gurgling sound and did not know if he was alive or dead. She was afraid that he was suffering and in pain. She noticed the gun in his hand. She removed it and placed it down on the bed. After removing a sock from his hand (to be more fully discussed hereinafter), she picked up the gun for a second time. It somehow accidentally went off, hitting her husband in the chest. She then replaced the gun on the bed near where it had been initially. This version of the gun going off accidentally must be viewed in the light of the ballistics evidence that the trigger had to be moved forward manually to the firing position before it could go off and with the fact that it took a twelve to thirteen pound trigger pull to discharge the weapon.

When the police discovered the body, the gun was lying beneath the right hand of the victim. Again, a troublesome physical fact had to be reconciled with the post-suicidal, accidental version of the third shot. The appellant testified that after accidentally shooting her husband and then placing the gun down on the bed (in the pool of blood), she picked up her husband's right arm to feel for his pulse. When she had finished, she placed his arm back on the bed and the right hand apparently came to rest on top of the gun.

The appellant, for all of her apparent solicitude for the husband who she professedly believed might still be alive and for all of her apparent candor, did not tell the police who arrived at the scene to tender help or the ambulance attendants or her friends or the medical personnel about the

accidental shooting. For all that appears, that version of the chest shot never saw the light of day until it became known that Dr. Fisher had concluded that the chest shot could not have been fired by the victim.

Another physical fact, unexplained, would not in retrospect have caused the appellant much grief. The explanation, however, was devastating. No fingerprints, of either the appellant or her husband, were found upon the gun. The laboratory technician expained that this was not unexpected because the gun was found in a pool of blood. Swabbings were taken of the right hand of the victim and a neutron activation analysis could not establish that he had fired the gun. Since the neutron activation analysis was also inconclusive even as to swabbings taken from policemen who did later test fire the gun, the finding was completely neutral. The version of the death scene testified to by the appellant did gratuitously provide a ready explanation for a circumstance which in retrospect needed no explanation. She testified that when she first saw her husband's body with the gun in the right hand, one of his blue socks was covering the hand.

Her first act was to remove the gun from the hand and then to remove the sock from the hand. She used the sock to mop blood from her husband's brow and then dropped it among the bedclothes. Why she did not take her husband's pulse when she was holding onto his hand and arm on that occasion (as opposed to later) was not explained. The bizarre sequence of actions could, of course, have been attributable to an unsuspecting wife's state of shock. It could also, as the individually innocuous fragments slowly come together into a meaningful mosaic, be attributable to the necessity of holding the taking of the pulse in reserve to account for getting the right hand of the victim back on top of the gun after the allegedly accidental third shot had been fired.

Strangely, when all of the garments and bedclothing were carefully taken to the morgue with the body and the gun, the bloody blue sock was missing and was never accounted for. Every other item was meticulously catalogued and examined. Strangely also, the appellant never mentioned the

presence of the sock or her actions with respect thereto to the policemen, the ambulance driver, the medical personnel or her friends. For all that appears, this information first saw the light of day at the appellant's trial. The blue sock apparently had significance for the appellant, however. When her furniture was moved back to Connecticut in late September, 1973, some three months after her husband's death, the appellant noticed the unbloodied mate to the missing blue sock. Although the appellant was not charged with her husband's murder until April 5, 1974, another six months later, the mate to the missing blue sock was carefully preserved as a defense exhibit.

With only two available hypotheses, into which does the fact of a blue sock fit more neatly and more logically? Why, it must be asked, would a man bent on suicide wish to keep his fingerprints off the suicide weapon and powder residue off his hand when the inescapable presence of the gun and the sock would explain both evidentiary absences? On the other hand, would not a murderess staging an apparent suicide have a definite need to keep her fingerprints off the gun and powder residue off her hands and a concomitant need to explain the absence of her husband's fingerprints from the gun and the absence of powder residue from his hands? The testimony about the sock was, in its net effect, a powerful boomerang.

Yet a third physical fact complicated the suicide plus accidental shooting theory. When the body was found by the police, a pillow was covering the chest. The pillow completely covered the entrance wound of the chest shot and even obscured the cheek wound. There was no bullet hole in the pillow or its case. Dr. Fisher explained that the chest shot could not have been fired with the pillow in that position and that the pillow had to be placed where it was after the chest shot had been fired. The pillow was squarely up against the front of the victim's body, extending from the nose to the stomach and obscuring from view all but the temple wound. For the victim's right hand to have been lying atop the gun, as it was, it was necessary for the entire right arm to be supported by the central mass of the pillow.

The appellant offered little by way of explanation here. She never mentioned the presence of any pillows or the moving by her of any pillows to police, friends or medical attendants. Even in detailing her every movement during direct examination, she never alluded to the central position of this pillow covering the entire front of her husband's body. On cross-examination, she could only say:

"Q. When you went over to your husband, you walked around the bed, was there a pillow in front of his chest?

A. There could have been."

At yet another point in the cross-examination:

"Q. When you fired the chest shot, accidentally, would you describe how he was lying?

A. He was on his side, kind of on an angle.

Q. On an angle?

A. Yes.

Q. And, did he have any of the pillows around him? Where would they have been?

A. They were around him.

Q. Around him?

A. Yes.

Q. Was there one against his chest?

A. I could have moved it when I went to take his pulse.

Q. I'm sorry, I didn't hear your answer.

A. I could have moved the pillow when I went to take his pulse."

If the pillow had been in front of her husband's chest when she found him, moving it to take his pulse could not account for the unobstructed chest shot since the pulse taking followed the second picking up of the gun, the allegedly accidental shooting and the final putting down of the gun. If, on the other hand, the chest was unobstructed when the appellant found her husband, no pillow had to be moved to take his pulse. The appellant testified to having

seen both her husband's right hand and the gun as she first approached the body.

To have moved the pillow into place after the chest shot, moreover, could not have been an inadvertent and subconscious action. It was placed flat against the front of the victim's body covering everything from his face to his stomach. After the pillow was in place, the victim's right arm had to be lifted and placed on top of it.

Under the alternative hypothesis, however, the placing of the pillow made some sense to a murderess staging an apparent suicide. The pillow, by hiding all but the temple wound, made a first glimpse of the body appear more traditionally suicidal (for whatever warped sense of momentary advantage that might have conferred). More significantly, the pillow made possible the positioning of the right arm so that the right hand rested squarely over the apparent suicide weapon as it lay in the pool of blood. It would not yet have been anticipated that the chest shot would somehow have to be explained as a post-suicidal accident, with the pillow as a mute impediment to that explanation.

The appellant attributed her failure of recall about the pillows to her state of shock. She also attributed her failure to tell anyone about the blue sock to her state of shock. She also attributed her failure to summon immediate medical aid for the husband who she believed might still be alive to her state of shock. Yet in other ways, both her recall and her deductive powers were contrastingly sharp. During cross-examination, the appellant was grilled as to why she had not told the police about the accidental shooting. She replied:

> "I knew he had shot himself twice but I don't know why the gun went off but I was worried that maybe that shot might have killed him."

The prosecutor remembered that the appellant had testified that she had not seen any bullet holes or entrance wounds.

Thinking he had caught the appellant in a fatal slip, he pounced:

> "A few moments ago you testified that although you didn't tell Officer Walbrecher about your shot, that you knew he had shot himself twice. How did you know he had shot himself twice?"

Neither her recollection nor her reasoning power on that occasion suffered from shock:

> "I heard two noises. When I saw him and I realized the gun was in his hand I knew where the two noises came from."

Another significant factor was both the absence and the presence of blood on the appellant and her clothing. She testified to having picked up the revolver from where it lay in a pool of blood, to having picked up her husband's hand from where it also lay in the pool of blood in order to take his pulse, to having wiped blood from the forehead, to having replaced the gun to where it came to rest in that pool of blood and to having replaced her husband's hand to where it came to final rest in that same pool of blood. Yet in all of the observations made of the appellant by her friends and by the police, including the swabbing of her hand for powder residue, no bloodstains were apparently observed upon her hands. Her minute-by-minute account of her activities did not include a washing of her hands. Under her testimonial version of her activities upon the finding of the body, the absence of blood from her hands was incredible.

Under the alternative hypothesis, however, the absence of blood from the hands logically fits the picture of a staged apparent suicide. The firing of the murder weapon itself would not have smeared her hands with blood. Only the placing of the gun under the victim's right hand might have done so and that undesired evidence would easily have been washed away. In the uncontested and clearly non-custodial version of her husband's apparent suicide given to Officer Ditty immediately upon his arrival at the death scene, the absence of blood smears from the appellant's hands was a

fact compatible with the simple sighting of the apparent suicide and the immediate leaving of the room. It would only have become incompatible when the testimonial version had to be expanded to encompass 1) the picking up of the gun, 2) the picking up of the right hand, 3) the removal of the blue sock from the hand, 4) the wiping of blood from the forehead with the blue sock, 5) the second picking up of the gun and the "accidental" firing thereof, 6) the final placing down of the gun, 7) the second lifting of the right arm, 8) the taking of the right pulse and 9) the final placing down of the right arm — each action squarely in a quarter of the bed bathed in blood.

Even more telling than that absence of blood was the presence of blood in a very different respect. An expert in serology (the study of blood) from the F.B.I. laboratory examined, *inter alia*, the housecoat worn by the appellant on the morning of her husband's death. A Benzidene Test (sensitive enough to detect blood in the amount of one part in 300,000 parts) showed positive for the possible presence of blood. A Takayama Test then confirmed that human blood was present on the robe, but in amounts too small for grouping. There were small flecks or "spatters of human blood". Defense counsel, in referring to the exhibit, characterized the flecks as "all these little spots". The flecks, moreover, were found in only two places — on the right arm of the robe and on the upper right front of the robe.

Dr. Fisher testified as to the possibility of blood spatters from the various gunshot wounds. The arm that held the gun for the chest wound would not have been spattered thereby. There were no major blood vessels involved and no significant bleeding — let alone spurting. The cheek wound which caused immediate death involved no significant bleeding. With respect to the temple wound, however, Dr. Fisher testified:

> "It would be my belief that some small spatters of blood might very well be blown three or four feet from the face of the deceased out into the air as a result of blood and foam blowing through his nose as he breathes."

134

The outstretched arm that held the gun for the temple shot would almost inevitably have been thus spattered. So too would the outstretched arm that held the gun for the quickly ensuing cheek shot:

> "Q. (By Mr. Kleid) Dr. Fisher, how long would blood spurt from the body through the nose and mouth, as you have indicated? How long would this occur?
>
> MR. BARNHOUSE: After what?
>
> Q. (By Mr. Kleid) After the gunshot wound number one that you have labeled was fired?
>
> A. It might have continued for a long time."

By the time, however, following the fatal cheek shot, that a person in a kitchen could have heard the shots, could have looked out the window, could have finished making hot chocolate, could have poured it into a cup, could have walked to the bedroom, could have placed the hot chocolate on a nightstand on one side of the bed and could have then walked around to the other side of the bed, the time for the spurting or spattering of blood had long passed:

> "Q. If the shot labeled number two were fired within a very, very short time thereafter, how long would it have continued?
>
> A. Well, as soon as shot number two is fired, things are over. I should say in less than half a minute, very quickly. Considerably less than half a minute because there is no bleeding in that wound itself.
>
> Q. Well, in considerably less, can you put a time frame on it?
>
> A. I would say that we probably ought to talk about four or five heartbeats, which is a few seconds."

The suicide plus accidental shooting theory made no effort to explain the blood flecks or spatters. The murder hypothesis, however, would indicate the likely presence of

blood spattering on the outstretched arm that fired the murder weapon and on the upper right chest behind it.

A final factor militating persuasively toward homicide rather than suicide is that even the self-serving testimony of the appellant herself revealed a bizarre inconsistency between her verbal protestations and her actions. Somewhere between 30 and 45 crucial minutes were allowed to slip away before medical aid was summoned for a critically wounded man who the appellant thought might still be alive. Officer Ditty, who actually beat the ambulance to the scene, received his trouble call at approximately 9 o'clock. The shooting, at the latest, was at about 8:15 to 8:20 a.m. Although no one could pinpoint time with any precision, outer limits were clearly discernible. The neighbor who heard the shots at first placed them at 8 o'clock or earlier. She knew what time she normally got up (at 7:30 or 8:00) and knew, furthermore, that she had on this morning to visit her husband in the hospital prior to 9 o'clock. Admitting that she did not specifically note the time when she heard the shots and agreeing with the pressing cross-examination as far as she could, she still would not take the occurrence significantly beyond 8 a.m. (10 to 15 minutes at most). The appellant herself was certain that she got up when her alarm went off at precisely 8:10 a.m. She had already been up earlier that morning and had been to the bathroom. Upon arising at 8:10 a.m., she simply put on her robe and went immediately to the kitchen. She drank a glass of orange juce and put a small amount of water on the stove to boil, enough to make a cup or so of hot chocolate. By the time that water had come to boil, she had heard the noises which turned out to be gunshots. She testified to a number of actions on her part before calling her friend Mrs. Maureen Rose. Mrs. Rose testified to having received that call at approximately 8:30 a.m. Both before and after that call, precious time was inexplicably lost if one believes the appellant's version that her husband lay critically wounded but, in her judgment, not necessarily dead.

We will juxtapose the appellant's statements as to her beliefs upon discovering her husband's body with her actions

in response to those beliefs. The appellant testified that when she first looked at her husband bleeding upon the bed, she heard noises emanating from him. In testimony, she characterized the noises as gurgling sounds. In an early statement to the police, she had referred to "moans". She testified that she was afraid that he was in pain and that she could not bear to see him suffer. She once stated, "I knew he was in pain." She allegedly mopped the blood from his brow with the blue sock in order to relieve his suffering. She took his pulse. When she finally got together with Mrs. Rose, the initial efforts were to contact a doctor and not the morgue. When the police arrived, she, according to Mrs. Rose, was anxiously inquiring as to whether her husband was alive or dead. She received no answer at that time. When it was recommended that she herself be taken to a hospital, she tried to insist on going to the same hospital to which her husband was being taken so she could keep current on his condition. She testified that as she first left her apartment that morning "my biggest concern was in helping Doug." She testified unequivocally that she never knew her husband was dead until the police so informed her at the Baltimore County General Hospital. Throughout the trial, the appellant insisted that she loved her husband deeply notwithstanding their troubled marital life. She was still devotedly wearing his wedding ring at the trial.

That testimony contrasts strangely with her actions upon finding him lying wounded. With respect to those actions, it is to be noted initially that the appellant did not so cringe away at the sight of blood as to be paralyzed into inaction. She was capable of removing the gun from under her husband's hand, of taking the blue sock off of his hand, of mopping the blood from his brow as he lay in apparent pain, of picking up the gun yet a second time, of replacing the gun and then taking her husband's pulse after she had accidentally shot him and then of replacing his arm upon the bed. Yet at no time did she scream or seek immediate help from her neighbors there in the same apartment building. At no time did she try to communicate with her husband,

"Doug, Doug, can you hear me?" At no time did she pick up the phone to call for an ambulance or for the police.

Her only call was to her friend Maureen Rose, who lived a block away. She did not, on the telephone, tell Maureen Rose what happened. Mrs. Rose testified that the appellant "said, very quietly, Maureen, come quick, hurry." Mrs. Rose, in turn, put on her robe, put her coat on over top of that, grabbed her son and his breakfast and drove her car to the appellant's apartment. The appellant was waiting for her outside. The appellant, "very quietly said, he shot himself." The appellant passively got into the car with Mrs. Rose and drove to Mrs. Rose's apartment. She did not insist that they go in and render immediate aid to a man whose life might then have been ebbing away with each passing second. She did not tell Mrs. Rose about the "accidental" third shot, about removing the sock from her husband's hand or about taking his pulse. When they got to Mrs. Rose's apartment, Mrs. Rose attempted to contact by telephone Dr. Ellin, the appellant's physician. When they had trouble reaching him, they had an operator break in on the line. Dr. Ellin was not informed about the accidental third shot or about the taking of the pulse. He instructed Mrs. Rose and the appellant to return to the apartment and indicated that he would call an ambulance and call the police. Mrs. Rose and the appellant were back in front of the apartment, but not inside, when Officer Ditty arrived. He was not informed by the appellant about the accidental third shot or about the pulse or about anything else that might have been of medical significance. When the ambulance attendants arrived, the appellant did not pass on to them any medically relevant information. Nor did she do so directly or indirectly after being taken to the Baltimore County General Hospital later that morning. Her actions were totally inconsistent with those of a concerned wife who believed that her husband might still be alive and could be saved if given the benefit of immediate emergency treatment.

The appellant's actions, unlike her words, were those of one who knew full well that her husband was dead. There

was no sense of emergency in terms of providing or summoning instantaneous medical attention. There was no effort to pass on critical information to the medical people when they did arrive. Thirty to 45 crucial minutes were inexplicably wasted away.

Before any of the contested motivational embellishment, inculpatory or exculpatory, intrudes into the case, the hard facts surrounding the *corpus delicti* compellingly support the judgment which Dr. Fisher was able to reach upon but a fraction of those hard facts:

> "It would be my opinion that the possibility of this being suicide is exceedingly remote. I have never seen any such case.
>
> . . .
>
> It is difficult to assign percentages to things but, ordinarily, when I say something is exceedingly remote I think of it in terms of one in a thousand or one in a hundred thousand."

This was the real case that was actually tried in front of the jury. Only against this backdrop of actuality do the constitutional issues, which in the abstract of brief and argument loom large, shrink into proper proportion. Such fringe issues as whether the appellant had or did not have some motive for killing her husband and whether Douglas Bartram had or did not have some motive for killing himself pale against the hard scientific reality that Douglas Bartram *did not* kill himself, for the simple reason that he could not have killed himself in the manner required by the physical evidence of his death. With this perspective of what the true battle was about at the trial level, we turn to the more rarified appellate issues.

### 1. The Miranda Issue

The appellant's first claim of constitutional error is that the trial court erroneously failed to suppress an oral statement given by the appellant to Detective Robert D. Walbrecher. The appellant claims that she was not given the warnings guaranteed her by *Miranda v. Arizona,* 384 U. S.

436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966). Before dealing with the merits of the claim, it will be helpful to narrow the focus in two regards.

The various responses which the appellant gave to different members of the police force on the morning and early afternoon of July 2, 1973, congeal into four distinct phases:

(1) When Officer Robert Ditty responded to the trouble scene at shortly after 9 a.m. on July 2, he received several bits of information from the appellant as she directed him into the apartment where her husband lay. After discovering the body, Officer Ditty received a very brief and cursory comment or two from the appellant as she was being ministered to by her friend Mrs. Rose in Mrs. Rose's apartment. There was no suggestion by the defense that *Miranda v. Arizona* was in any way implicated or violated in this brief, on-the-scene confrontation. Indeed, nothing was said by the appellant remotely damaging enough to call for an objection by her. This phase is not before us.

(2) When the appellant was taken to the Baltimore County General Hospital, Detective Robert Welbrecher was initially in attendance. While she was in a cubicle in the emergency room, she gave orally to Detective Walbrecher her version of her husband's apparent suicide. This statement was objected to and was held to be admissible. It is the sole basis for the present contention.

(3) As evidence began to accumulate and as suspicion began to focus upon the appellant, Detectives Todd and Wise relieved Detective Walbrecher and commenced a more formal interrogation of the appellant. This began at the Baltimore County General Hospital. It was subsequently adjourned to . . .

(4) The Garrison Forest Police Station where Detectives Todd and Wise continued their more formal interrogation of the appellant and ultimately reduced the statement she gave to writing. This formal interrogation by Detectives Todd and Wise both in its Baltimore County General Hospital stage and in its Garrison Forest Police Station stage was ruled to be custodial in nature and therefore in violation of *Miranda*

*v. Arizona.* The statement forthcoming from this interrogation was suppressed and is not before us on the present issue.

As we narrow our focus to the oral statement made to Detective Walbrecher by the appellant shortly after her arrival at the Baltimore County General Hospital, it is also necessary for us to focus upon what ruling is now being subjected to our appellate review. The appellant filed a pretrial motion to suppress, *inter alia,* this statement. A full hearing was conducted before Judge Kenneth C. Proctor on November 22, 1974, at the conclusion of which he ruled this statement to have been admissible. When the case came on for trial before Judge H. Kemp MacDaniel on April 2, 1975, however, the appellant formally moved to renew the motion to suppress the statement and to have Judge MacDaniel conduct his own hearing thereon and to make his own ruling with respect thereto. Judge MacDaniel granted the defense motion and conducted a full hearing on the question, at the conclusion of which he also ruled the statement to be admissible.

In a situation such as this when a defendant obtains a full *de novo* hearing on a suppression question, we will confine our review to the *de novo* ruling. Even had Judge Proctor committed some error at the initial hearing (we are not suggesting that such was remotely the case), that error would be rendered moot by the granting of the *de novo* hearing. The prior ruling was in effect wiped out and the critical determination that counted in the case was that made at the relitigation of the suppression question. We look only to it.

With the ruling that is under review now fixed in mind, we will scrupulously confine our review to the evidence offered Judge MacDaniel so that he could make his ruling. In appellate briefs, both appellant and appellee have ranged far and wide in offering upon this question both testimony that was produced before Judge Proctor at the initial hearing and testimony which came in before Judge MacDaniel either upon the merits or upon other issues after he had made his

ruling on this particular issue. We deliberately factor out all such testimony for present purposes. As Judge Powers recently and carefully pointed out for this Court in *Braun v. Ford Motor Company*, 32 Md. App. 545, 363 A. 2d 562 (1976):

"We know of no principle or practice under which a judgment of a trial court may be reversed or modified on appeal except for prejudicial error committed by the trial judge. It is a misuse of language to label as error any act or failure to act by a party, an attorney, a witness, a juror, or by anyone else other than the judge. In other words, error in a trial court may be committed only by a judge, and only when he rules, or, in rare instances, fails to rule, on a question raised before him in the course of a trial, or in pre-trial or post-trial proceedings. Appellate courts look only to the rulings made by a trial judge, or to his failure to act when action was required, to find reversible error."

In keeping with that wise, though oft-neglected, admonition, it follows that Judge MacDaniel could not have committed error on April 2, 1975, upon the basis of testimony offered before some other judge four months earlier. Nor could he have committed error on April 2, 1975, on the basis of testimony that had not yet been given and would not be given until April 3, 4, 7, 8, 9, 10 or 11. The only witness who testified before Judge MacDaniel on this limited question was the appellant herself and he was able to make his judgment upon the basis of that testimony alone.

Upon our own constitutionally mandated, independent judgment of this mixed question of law and fact, we conclude, as did Judge MacDaniel, that no error was committed in admitting the oral statement given to Detective Walbrecher in evidence. We further hold, by way of deliberately considered alternative holding, that even if error were deemed to have occurred, such error would be harmless beyond a reasonable doubt.

*A. Miranda Was Not Violated Because Miranda Did Not Apply.*

At issue here is not the question of police compliance with *Miranda,* but rather the threshold question of *Miranda's* applicability. Before *Miranda* will apply, it is necessary that the statement in issue be one that was made in response to police interrogation and it is further necessary that the interrogation be conducted in custodial surroundings. It is the element of custody that we find lacking in this case. As we made very clear in *Cummings v. State,* 27 Md. App. 361, 364, 341 A. 2d 294:

> "*Miranda,* in precise terms, was aimed not at self-incrimination generally (even in response to police interrogation) but at *compelled* self-incrimination — the inherent coercion of the custodial, incommunicado, third-degree questioning process. Its holding was set out at 384 U. S. 444:
>
>> 'Our holding will be spelled out with some specificity in the pages which follow but briefly stated it is this: the prosecution may not use statements, whether exculpatory or inculpatory, *stemming from custodial interrogation* of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.*' (Emphasis supplied)
>
> A scanning of *Miranda* makes its thrust preeminently clear. 'The constitutional issue we decided in each of these cases is the admissibility of statements obtained from a defendant questioned while in custody or otherwise deprived of his

freedom of action in any significant way. In each, the defendant was questioned by police officers, detectives, or a prosecuting attorney in a room in which he was cut off from the outside world.' *Ibid.,* at 384 U. S. 445."

It is the inherent coercion of the custodial surroundings that supplies the compulsion element of compelled self-incrimination.

"The constitutional distillate of *Miranda* is that self-incrimination flowing from a custodial interrogation is, *ipso facto, compelled* self-incrimination because of the inherent coercion — the inherent compulsion — of the custodial interrogation environment. In the custodial interrogation situation, therefore, the constitutionally damning element of compulsion can only be extirpated by the elaborate prophylactic process of warning and waiver prescribed by *Miranda* as the required compulsion antidote. Absent the compulsion, there is no need for the antidote." *Cummings v. State, supra,* at 27 Md. App. 366-367.

With custody therefore being the criterion, we turn to the facts surrounding the statement now in issue. When Officer Ditty first arrived at the appellant's apartment, he discovered Douglas Bartram's body and then, out of solicitude for the appellant, would not let her go into the apartment. Officer Ditty asked Mrs. Rose if she could take the appellant somewhere and Mrs. Rose, in response, took the appellant to her apartment. When Officer Ditty shortly thereafter came to Mrs. Rose's apartment, Officer Ditty recommended that the appellant go to the hospital. This was in at least partial response to Mrs. Rose's suggestion that the appellant had a problem with high cholesterol and with pains in the chest and was terribly nervous and that "it might be best if she go to the hospital and have them check her over." The police did not take the appellant to the hospital; she was taken there on a stretcher by the

ambulance drivers in the ambulance. She was there placed in a small cubicle in the emergency room, having arrived there at approximately 9:30 a.m. She was subsequently joined there by Officer Walbrecher. The ambulance attendants were in the room when Officer Walbrecher arrived but left shortly thereafter. Even according to the appellant, Officer Walbrecher's inquiry was neither accusatorial in tone nor in focus:

> "Q. What if anything did Officer Walbrecher say to you at that time?
>
> A. He asked me to tell him what had happened."

The appellant told Officer Walbrecher what had happened and the entire interchange lasted, according to her testimony, "about five minutes." A doctor then came into the room and asked the appellant whether she was injured. Officer Walbrecher left the room and stood outside. The doctor informed the appellant that her own physician, Dr. Garber, had been notified and that the hospital was waiting for Dr. Garber to give a prescription. Although the appellant indicated that she wanted to leave, the doctor told her just to "sit back and relax." It was only after the doctor left that Officer Walbrecher returned to the room. He had one further conversation with the appellant which lasted "at least as long as the first." At one time the appellant had asked Officer Walbrecher if she could leave the hospital and he made the statement to her "that they had to wait for the doctor to release me." Officer Walbrecher then went outside the room again. This concluded that phase of conversation now under scrutiny for admissibility purposes.

The only other shred of evidence on this question was the actual report made by Officer Walbrecher, which was offered by the appellant. The only significance the report had was that it classified the death of Douglas Bartram as a "suspicious death." The appellant's attempt to argue from this characterization that the investigation had begun to focus upon her is totally misplaced since the classification of "suspicious death" would apply to an apparent suicide just as surely as it would apply to an apparent homicide. The

first officers upon the scene had observed simply the bullet hole in the temple. An apparent suicide called for investigation.

Upon this evidence, Judge MacDaniel made the following ruling:

"I completely agree with Judge Proctor's determination in this issue. The evidence, as presented to me does not convince this Court — the police had nothing to do with your client going to the hospital. They did not insist on taking her and did not say that she had to go to the hospital. She went there because there was a suspicion of a heart condition. It was recommended by her friend and she went to that hospital. The police, under normal circumstances, when a death has happened — there is nothing to indicate that she was under any suspicion or anything of that nature at that time. All they were trying to do was gain information for their report. She was not placed in a situation where she was told that she could not leave. That came from her own testimony. She said that she asked the police officer if she could leave and she said that he said it was up to her doctor, which indicates that she was free to leave if her doctor said so. Whether she wanted to wait for the doctor was her decision. There was no restraint on her whatsoever. There was no pressure put on her. She was not in surroundings where you could say she was under an investigation or that she was a suspect or anything of that nature.

I think this case is very distinguishable from the cases that you quoted, and under all these circumstances I cannot see how your client was under any impression that she was being forced to do anything, at that particular time, by the police or under any incommunicado situation or not in surroundings produced by police. It had not yet reached that crucial stage where she was entitled to

be warned and entitled to have an attorney present. I therefore overrule your motion, sir."

In affirming Judge MacDaniel's judgment that there was no custody such as to engage the gears of *Miranda,* we find the facts in the present case remarkably parallel to those in *Cummings v. State.* We there set out (with extensive citations) a number of the factors that bear on the issue of custody.

*(1) The Place of Interrogation*

"Although the place of interrogation is not the conclusive or sole factor to be considered in determining the fact of custody, it is a vital factor. The consensus of American case law is that the questioning of a suspect who is confined in a hospital but who is not under arrest is not a custodial interrogation within the contemplation of *Miranda." Cummings v. State,* 27 Md. App. 369-370.

See also *Tillery v. State,* 3 Md. App. 142, 146-147, 238 A. 2d 125, 127-128, where we held that the absence of *Miranda* warnings in a hospital interrogation was immaterial because the interrogation was non-custodial. In the present case, the conversation of Officer Walbrecher with the appellant was in the hospital cubicle to which she had been taken for treatment by the ambulance drivers, at the suggestion of her friend, and where she was awaiting a prescription from her personal doctor.

*(2) The Time of Interrogation*

"Another factor that bears upon the question of custody is whether the interview is conducted during normal business hours or is conducted at an odd hour of the night." *Cummings v. State,* 27 Md. App. 372.

The hospital interview in the present case occurred between 9:30 a.m. and 10:30 a.m. on a Monday. Although this is but a peripheral factor, we feel as we did in *Cummings*:

"This fact, though not itself conclusive, helps tilt

the interview in question toward the non-custodial side of the spectrum." 27 Md. App. at 373.

*(3) Persons Present During Interrogation*

"*Miranda* stresses the coercion inherent in being 'isolated,' held 'incommunicado,' and being 'cut off from the outside world.' 384 U. S. at 445. It follows that the presence of 'friends or neutrals at an interview is a fact of some relevance. 384 U. S. at 461, 478 n. 46. *Miranda* speaks of a suspect being 'surrounded by antagonistic forces.' 384 U. S. at 461." *Cummings v. State,* 27 Md. App. 373.

In the present case, first ambulance attendants, then a doctor and then a nurse were freely allowed in and out of the room and, indeed, Officer Walbrecher would leave the room whenever they came in.

*(4) The Indicia of Formal Arrest*

"The existence of physical restraint has almost invariably led to a finding of custody.

. . .

Conversely, the absence of physical restraint tends to indicate non-custody." *Cummings v. State,* 27 Md. App. 374-375.

In the present case, Officer Walbrecher did not exercise any police power so as to indicate any legal restraint on the appellant. The only indication of any type of restraint upon the appellant was the advice to her that she should not get up and leave until the doctor told her that she might do so. Indeed, the doctor at Baltimore County General Hospital was waiting for the prescription to come through from the appellant's personal doctor.

"It has been held in a number of cases that the presence or absence of fingerprinting, photographing and other booking procedures have a bearing on the question of custody." *Cummings v. State,* 27 Md. App. 375.

There was no fingerprinting, photographing or other booking procedure directed toward the appellant either prior to or during her conversation with Officer Walbrecher.

> "It has similarly been held that telling a suspect that he is under arrest indicates custody for *Miranda* purposes. . . . Conversely, the fact that an officer does not tell a suspect that he is under arrest is a circumstance tending to negate custody." *Cummings v. State*, 27 Md. App. 375.

The appellant was at no time told or led to believe that she was under arrest.

*(5) The Length and Mood of the Interrogation*

> "The cases hold that the brevity of an interrogation, the friendly demeanor of the officer and the short and neutral nature of the inquiries all tend to negate the notion of custody." *Cummings v. State*, 27 Md. App. 376-377.

The mood of Officer Walbrecher was at all times friendly and solicitous. The total interview consumed somewhere between 10 and 15 minutes — "about 5 minutes" before one of the doctors interrupted the interview and then a resumption thereof "at least as long as the first." The tone, moreover, was not accusatorial in nature. A policeman, investigating an apparent suicide, was seeking to learn from an apparently bereaved wife the circumstances surrounding her husband's apparent suicide.

*(6) Lack of Arrest After Interrogation*

> "It is almost universally the law that where a suspect is not arrested and is allowed to remain free following the interview, the interrogation is deemed to have been non-custodial." *Cummings v. State*, 27 Md. App. 378.

The appellant was not arrested on July 2, 1973. Indeed, formal proceedings against her did not begin until she was indicted some six months later.

The situation here was very analogous to that dealt with by us in *Matter of Carter and Spalding*, 20 Md. App. 633, 318 A. 2d 269. In dealing with statements made by two juveniles — one in a hospital and the other in a police station — Judge Moore, in an excellently reasoned opinion, held that there was no such custody as to call for the prophylactic warnings of *Miranda*:

> "The short answer to this contention is that appellants were not in custody at the time of the statements in question. To hold otherwise would be to find custodial interrogation in any case where a police officer was present and participating or where the questioning took place at a police station. . . . Custody thus requires a significant deprivation of the freedom of one upon whom the eye of criminal suspicion has begun to focus. To see the matter thus is to perceive the considerable distance separating custodial interrogation from the questioning that took place here." 20 Md. App. at 642-643.

See also *Burton v. State*, 32 Md. App. 529, 363 A. 2d 243 (1976).

One comment is in order in response to the appellant's urging, in her brief, that "the Supreme Court has consistently demonstrated that the definition of 'custodial interrogation' is to be given the broadest possible reading." To give "the broadest possible reading" to *Miranda* in any respect is simply not the current tenor of Supreme Court thinking. The constitutional interpretations of that Court are not immutable as the laws of the Medes and the Persians. It is to blink at reality for the law to pretend not to see what every literate layman knows — that *Miranda v. Arizona* is in definite disfavor with the strong majority of the present membership of the institution charged with interpreting the law of the land. *Miranda* has not been overruled and is not likely to be overruled. The disfavor is manifested by its being read and applied in a restrictive rather than an expansive manner.

In *Harris v. New York*, 401 U. S. 222, 91 S. Ct. 643, 28 L.Ed.2d 1 (1971), the Supreme Court refused to exclude a statement taken from a defendant in violation of *Miranda*, when the statement was offered by the State in rebuttal for purposes of impeaching the defendant. In doing so, the Court significantly eroded the broad rhetoric of *Miranda*, saying at 401 U. S. 224:

> "Some comments in the Miranda opinion can indeed be read as indicating a bar to use of an uncounseled statement for any purpose, but discussion of that issue was not at all necessary to the Court's holding and cannot be regarded as controlling."

In a despairing dissent, Justice Brennan accurately assessed the impact of *Harris* upon *Miranda* when he characterized *Harris* as operating to "seriously undermine" *Miranda* and saying that *Harris* "goes far toward undoing much of" *Miranda*.

In *Michigan v. Tucker*, 417 U. S. 433, 94 S. Ct. 2357, 41 L.Ed.2d 182 (1974), the Supreme Court refused to consider a "mere *Miranda*" violation significant enough to serve as the primary illegality necessary to trigger the "fruit of the poisonous tree" doctrine. It denigrated the *Miranda* rules from the constitutional status of being part and parcel of the right against self-incrimination, treating them rather as "only the prophylactic rules developed to protect that right," 417 U. S. at 439; as a "series of recommended 'procedural safeguards,'" 417 U. S. at 443; as "suggested safeguards," 417 U. S. at 444; as "only . . . the prophylactic standards later laid down by this Court in *Miranda* to safeguard that privilege," 417 U. S. at 446.

In *Oregon v. Hass*, 420 U. S. 714, 95 S. Ct. 1215, 43 L.Ed.2d 570 (1975), the Supreme Court expanded the *Harris* erosion of *Miranda*, holding that a statement taken in disregard of a defendant's request for counsel made in response to the *Miranda* warnings would not be excluded for impeachment purposes. Again in dissent, Justice Brennan, joined by Justice Marshall, surveyed the further erosion of *Miranda*,

"The Court's decision today goes beyond *Harris* in undermining *Miranda.*" 420 U. S. at 725.

The most recent indication of the Supreme Court's attitude toward *Miranda* came on May 19, 1976, with its decision in *United States v. Mandujano,* 425 U. S. 564, 96 S. Ct. 1768, 48 L.Ed.2d 212. A suspect upon whom criminal suspicion had definitely focused (he had negotiated the sale of narcotics with an undercover government agent) was summoned before a grand jury. He appeared under that legal compulsion. He was not given *Miranda* warnings. When his testimony before the grand jury was later used against him, he invoked *Miranda.* He prevailed at the District Court where it was held that he was a "putative" or "virtual" defendant entitled to *Miranda* warnings. 365 F. Supp. 155 (W.D. Tax. 1973). This ruling was upheld by the United States Court of Appeals for the Fifth Circuit. 496 F. 2d 1050 (C.A. 5, 1974). He was in the grand jury chamber under compulsion. He was without benefit of counsel. Investigation had focused upon him. He was in strange and unfamiliar surroundings. Notwithstanding all of this, the Supreme Court held that this was not custody within the contemplation of *Miranda,* saying at 48 L.Ed.2d 223-224:

> "The court's analysis premised upon the prosecutor's failure to give *Miranda* warnings, erroneously applied the standards fashioned by this Court in *Miranda.* Those warnings were aimed at the evils seen by the Court as endemic to police interrogation of a person in custody. *Miranda* addressed extra-judicial confessions or admissions procured in a hostile, unfamiliar environment which lacked procedural safeguards. The decision expressly rested on the privilege against self-incrimination; the prescribed warnings sought to negate the 'compulsion' thought to be inherent in police station interrogation. But the *Miranda* Court simply did not perceive judicial inquiries and custodial interrogation as equivalents: '. . . the compulsion to speak in the isolated setting of the police station may well be greater than in courts or

other official investigations, where there are often impartial observers to guard against intimidation or trickery.' . . .

. . . Indeed, the Court's opinion in *Miranda* reveals a focus on what was seen by the Court as police 'coercion' derived from 'factual studies [relating to] police violence and the 'third degree' . . . physical brutality — beating, hanging, whipping — and to sustained and protracted questioning incommunicado in order to extort confessions. . . .' *Miranda, supra* . . . . To extend these concepts to questioning before a grand jury inquiring into criminal activity under the guidance of a judge is an extravagant expansion never remotely contemplated by this Court in *Miranda*; the dynamics of constitutional interpretation do not compel constant extension of every doctrine announced by the Court."

In keeping with "the law of the land" as it is currently being manifested, we decline to push outward the coverage of *Miranda*. In conclusion, *Miranda* was not applicable to the hospital interview now in issue. Therefore, "compliance" would have been surplusage; "violation" would have been impossible.

## B. Even If There Had Been Error, It Would Have Been Harmless

By way of deliberately considered alternative holding,[1] we conclude that even if the admissibility of the statement now

---

1. After having made a painstaking review of the entire record, we believe it to be in the interest of sound judicial economy to offer this alternative holding. If for any reason, the Court of Appeals or the Supreme Court were to reverse our holding with respect to the *Miranda* issue, they would certainly remand the case to us, in any event, for the unavoidable consideration of the ensuing harmless error question. Since their writs of certiorari would probably have been limited in terms of legal issue or issues to be considered by them and since their record extracts would almost certainly have been less than the entire record, they would themselves be hampered in terms of determining harmless error.

Moreover, we assume that neither of those courts would concern itself with such an essentially *ad hoc* issue. A "certiorari court" is concerned, by the very statement of its mission, not with possible error affecting only an

in issue were somehow deemed to be error, that error would be harmless beyond a reasonable doubt. *Chapman v. California,* 386 U. S. 18, 87 S. Ct. 824, 17 L.Ed.2d 705 (1967); *Harrington v. California,* 395 U. S. 250, 89 S. Ct. 1726, 23 L.Ed.2d 284 (1969). It is, of course, settled law that a *Miranda* error can, indeed, be harmless error. *Milton v. Wainwright,* 407 U. S. 371, 92 S. Ct. 2174, 33 L.Ed.2d 1 (1972); *Collins v. State,* 14 Md. App. 674, 288 A. 2d 221.

The brief oral statement given by the appellant to Officer Walbrecher was in no sense a confesssion. The officer, in dealing with an apparent suicide case, was simply attempting to learn from the wife some of the circumstances surrounding the husband's death. "I asked her what had happened." Her response to that non-accusatory inquiry was to give her essentially exculpatory version of the apparent suicide. In the course thereof, however, she revealed two related facts which had inculpatory potential in terms of supplying possible homicidal motivation.

In referring to a domestic incident that occurred on the Thursday, four days before the shooting, Officer Walbrecher recounted, "She told me about how she had a fight with her husband," and "She said that her husband had told her to leave at that time." The second related matter concerned the appellant's return to her home on Sunday, the day before the shooting. Officer Walbrecher recounted, "She told me that she went back and found her husband home with a Miss Pope and . . . she told me that her husband was having an affair with this Miss Pope." The appellant went on to describe how she went to bed in the living room on that final Sunday night and how her husband and Miss Pope "went to bed in the master bedroom." Miss Pope left in the morning before the shooting took place.

---

individual case, but rather with significant legal questions where there is broad precedential interest for bench and bar. Provided only that the correct test for harmless error is being applied, of course, the actual application of that test to a given accumulation of evidence is patently nothing more than an appellate-level piece of fact-finding by an exclusively fact-finding standard ("beyond a reasonable doubt") and affecting only the outcome of an individual case. A further review of such an *ad hoc* factual judgment call would be preeminently nothing more than a *de novo* factual judgment call and hardly such stuff as "certiorari" is made of.

The intrusion of Miss Pope into the domestic picture served to supply certainly a possible homicidal motivation. In assessing the net impact of the admissions, however, we bear two things in mind. Initially, the physical facts surrounding the shooting so compellingly indicated that the killing had to be homicidal rather than suicidal that the existence of a motive was virtually superfluous as evidence of guilt.

Derogating even further from the significance of the admissions was the fact that the substance of both of those admissions came out more directly, more dramatically and in greater detail through the uncontested testimony of a number of witnesses.

With respect to the domestic quarrel on the Thursday before the fatal Monday, Maureen Rose, the appellant's neighbor and friend, testified that she received a telephone call from the appellant on the day in question and that the appellant told her about the quarrel and "was quite upset." Mrs. Ruth Suplee, another friend of the appellant, testified that because of the Thursday quarrel, the appellant came to the Suplee house and remained there over both Thursday and Friday nights. The appellant's father, Joseph Pcolka, of Bridgeport, Connecticut, testified that his daughter came home on the Saturday of that last weekend because of a quarrel with her husband over money. The appellant's mother, Mrs. Evelyn Pcolka, testified as did her husband but in greater detail. She stated that she gave her daughter a check to take back to Baltimore on that last Sunday morning in order to help alleviate the financial dispute. Katherine Pope, the husband's mistress, who had been intimately familiar with the entire family picture for several years, testified in great detail about the running quarrel between the appellant and her husband from Thursday through Sunday. The appellant herself took the stand and spread out every detail of the quarrel, of her trip first to Mrs. Suplee's and then to Connecticut, and of virtually every word directed by her husband toward her.

By the same token, the passing reference to the mistress — Miss Pope — in the admission to Officer Walbrecher was

lost in the overwhelming avalanche of uncontested testimony with respect to the adulterous relationship. Mrs. Rose, called by the defense, testified as to the appellant's reaction immediately after the shooting, saying, "When we came into the apartment she said to me, 'I loved him so much that I even allowed another woman to be with him.' "

The other woman, Katherine Pope, gave testimony that covered 170 pages of transcript. She described in great detail the adulterous affair that she had been having with Douglas Bartram on a weekly basis for several years. She described how that relationship was carried on with the full knowledge of the appellant throughout that several-year period. She described how the appellant would sometimes drive her husband to Connecticut for the adulterous weekend assignations and drop him off, how the weekends were frequently spent at the Baltimore apartment of the appellant and her husband with all three parties present and how the threesome would sometimes meet at a halfway spot in a motel along the New Jersey Turnpike where the three would then spend the weekend together.

The appellant herself, in even fuller and more lurid detail, described the unusual *menage à trois* in which the three had lived on virtually every weekend over the several-year period. She described how the threesome would sleep in the same bed and how her husband would frequently have sexual intercourse with Miss Pope and would then turn immediately to her and give her a hug by way of affectionate appreciation for her understanding. It was the appellant who frequently gave Miss Pope the money for tolls and mileage for the weekend round trip from Connecticut. The appellant sometimes made a snack for Miss Pope to enjoy on her Monday morning drive home. The appellant described how on several occasions her husband persuaded both the appellant and Miss Pope to engage with him in some, not fully described, triangular sexual encounter.

Under all of the circumstances, the spare and passing reference to Miss Pope in a mere phrase or two and introduced indirectly through the conduit of Officer Walbrecher was lost in the hundreds of pages of dramatic

testimony that came directly from the mouths of the wife herself and of the "other woman." We are persuaded beyond all peradventure of a doubt that the passing references to the quarrel and to the mistress made to Officer Walbrecher did not contribute in any way to the verdict of the jury.

### 2. The "Fruit of the Poisonous Tree" Issue

The appellant objected to the use of Katherine Pope as a witness, claiming that her testimony was the "fruit of the poisonous tree." [2] *Washburn v. State,* 19 Md. App. 187, 310 A. 2d 176. At an oversimplified level, her claim is that the police only learned of the existence of Katherine Pope through unconstitutional interrogation of the appellant in contravention of her privilege against self-incrimination. Unfortunately, that straightforward proposition is bedeviled by agonizing nuances. The allegedly "poisoned tree" of police interrogation was not a monolithic trunk but consisted of three branches, each slightly more toxic than its predecessor. The fruit, moreover, was a mixed bowl. A first piece of slightly green fruit came from the first and least toxic (according to Judge MacDaniel and ourselves, a "non-toxic") branch. A second and riper piece came from either the second or third branch. The problem becomes one in differential calculus.

The first branch of the tree was the brief hospital interview between Officer Walbrecher and the appellant, which we have already analyzed in Part 1 of this opinion and found to have been non-custodial. The fruit of that interview was the knowledge 1) that there was another woman who

---

**2.** Initially articulated by Justice Holmes in *Silverthorne Lumber Company v. United States,* 251 U. S. 385, 40 S. Ct. 182, 64 L. Ed. 319 (1920); christened with its present name by Justice Frankfurter in *Nardone v. United States,* 308 U. S. 338, 60 S. Ct. 266, 84 L. Ed. 307 (1939), and fully developed in *Wong Sun v. United States,* 371 U. S. 471, 83 S. Ct. 407, 9 L.Ed.2d 441 (1963). Its literature is rich: Pitler, *"The Fruit of the Poisonous Tree" Revisited and Shepardized,* 56 Cal.L.Rev. 579 (1968); Bernstein, *The Fruit of the Poisonous Tree: A Fresh Appraisal of the Civil Liberties Involved in Wiretapping and Its Derivative Use,* 37 Ill.L.Rev. 99 (1942); Maguire, *How to Unpoison the Fruit — The Fourth Amendment and the Exclusionary Rule,* 55 Journal of Criminal Law, Criminology, and Police Science 307 (1964); Note, *Fruit of the Poisonous Tree — A Plea for Relevant Criteria,* 115 Pa. L.Rev. 1136 (1967).

had slept with the victim the night before his death and 2) that her name was "Miss Pope." Having found that branch of the tree to have been non-poisonous, we hold that its fruit passes constitutional inspection.

The second piece of fruit was similar but somewhat fuller and riper (as a lead to a potential witness). In essence, "Miss Pope" was given a first name "Katherine" and her address in Connecticut was learned. It is the position of the appellant that the first lead was not enough and that the police would never have located the witness but for the fuller information emanating from the follow-up interview. The difficulty in assessing even the threshold question of even minimal error is that that follow-up interview conducted by Detectives Wise and Todd was in two stages, initially at the hospital and then at the Garrison Police Station. It began as something non-custodial in nature but slowly and imperceptibly ripened into something custodial in nature.

For admissibility purposes at the suppression hearing, all that mattered was that the ultimate statement, reduced to writing by the police and being offered by the State in chief, was concluded after the interrogation had matured into a custodial one requiring the *Miranda* warnings. For that reason, the statement given to Detectives Wise and Todd was suppressed. Testimony did not pinpoint and neither court nor counsel dealt with the finer metaphysical point of precisely when on the "non-custody to custody" continuum, the information about Katherine Pope first dropped from the tree. Was it before "custody" engaged the gears of *Miranda* or afterward?

It would appear to have come early in the interview when the mood and character of that interview was still non-custodial. Detectives Wise and Todd, who had not been to the death scene, arrived at the Baltimore County General Hospital at 12:15 p.m. Detective Wise testified as to the character of their mission:

> "I was advised to go to the hospital, like I said, and the only knowledge that I had was that I was to talk to a woman concerning an apparent suicide.

She was the wife of the victim of an apparent suicide."

He testified as to the tone and mood of the interview:

"Q. What if anything did you do?

A. Conducted an interview. The gist of it was to find out, you know, like I say, I assumed it was a suicide, that was my impression. I was to find out — normally what we do is find out why a person would do it.

. . .

A. To the best of my recollection, sir, I was under the assumption that it was a suicide and I put the question to Mrs. Bartram that we would like to know what would make a man do this, as we do in all cases."

The interview was not conducted in the question and answer mode. The appellant launched into a narrative beginning with the Thursday argument. As Detective Wise put it, "We went into a long story." He testified as to the length of this initial phase of the interview at the hospital and as to why no *Miranda* warnings were given:

"A. I didn't give her any warnings because I wasn't considering her a suspect of any kind. I was just conducting an interview on the death of a person.

Q. How long did this interview last?

A. I would have to make a guess and say it was maybe 15 or 20 minutes at the longest."

At another point, referring still to the hospital phase, Detective Wise responded to the court:

"Q. (By the Court) Suppose she wanted to leave and you were there interrogating her. Suppose she said to you, I don't want to talk to you anymore, I want to leave. What would you have done?

A. I would have had to leave her go. I had no
   reason to hold the woman." [3]

It would appear that the subject of "Miss Pope" would have arisen early in the interview. The first thing which Detective Wise did upon arriving at the hospital was to "discuss the matter with Officer Walbrecher":

"Q. Did you ask him what information he had
   gotten from her, had already gotten from her?
A. I sure did and I got a brief summary of what he
   had."

The "other woman" was a matter of immediate interest as a possible suspect. As soon as the police got back to the Garrison Station, a check was made with Connecticut authorities on Katherine Pope:

"Q. When this talk of the other woman came up,
   that aroused your suspicion so much that in
   fact a call was made to Hamden to verify the
   whereabouts of Miss Pope to eliminate her as a
   suspect, wasn't it?
A. Yes."

The significant shift toward the custodial side of the spectrum came when the interview was adjourned to the Garrison Police Station.[4] The police moved to their home ground because they felt more comfortable about conducting an interview there. They wanted, moreover, to take a swabbing of the appellant's hands for purposes of neutron activation analysis. She was taken to the Garrison Station in a police car rather than being allowed to drive with one of her friends. She was not allowed to go home and change into her street clothes, or at least she was given that impression. Late in the contested interview, at 2:20 p.m., a phone call

---

3. Judge MacDaniel found as a fact that the testimony of Detective Wise was truthful. See *Walker v. State*, 12 Md. App. 684, 280 A. 2d 260.

4. The Court recognized the possible subtle distinction between the two phases but did not feel constrained to draw too fine a line, "There may have been, Mr. Kleid, a part of that interrogation at the hospital that was all right but it is too difficult for the Court. . ."

came into the officers from the morgue. This was the first contact with the morgue. As a result of that phone call, the detectives then gave the appellant full *Miranda* warnings. She invoked her rights and the interview stopped.

In any of its subtle permutations, the "fruit of the poisonous tree" doctrine will avail the appellant naught, for three distinct and independent reasons.

### A. A "Mere Miranda" Violation Is Not of Constitutional Dimension So As to Serve as a "Primary Illegality"

Although we have held that the first mention of "Miss Pope" occurred during a clearly non-custodial interview by Officer Walbrecher and although it further appears likely that the second and more particularized reference to Katherine Pope occurred at a stage of the interview by Detectives Wise and Todd before it had become custodial enough to engage the gears of *Miranda*, such constitutional findings are not indispensable to the disposition of the "fruit of the poisonous tree" issue. Even if custody had attached at the very outset of the interview conducted by Detectives Wise and Todd, preeminently the violation was a "mere *Miranda*" violation and not a more basic, constitutional violation going to the heart of traditional voluntariness. There was no suggestion that the appellant was forced, coerced or threatened in any way to make a confession. There was no prolonged period of incommunicado detention sweeping her away from familiar surroundings or denying her sleep, food or drink. There were no inducements or promise made to her to obtain a confession. By traditional, pre-*Miranda* standards, there was not a glimmer of that type of involuntariness that is the product of a will overborne. *A fortiori*, even if our holding with respect to the non-custodial nature of the first interview conducted by Officer Walbrecher were held to be erroneous, the violation there would be palpably a "mere *Miranda*" violation and not something touching the deeper nerve of compulsory self-incrimination.

Although the earlier, pretrial rulings of Judge Proctor are not the subject of our review, we find, upon our separate review of essentially the same evidence offered before Judge

MacDaniel, one of those rulings highly persuasive in the distinction it draws in this regard:

> "You can use the remainder of her statement, under *Harris*, in cross-examination of Defendant."

That the distinction between a "mere *Miranda*" violation — a departure "only from the prophylactic standards later laid down by this Court in *Miranda* to safeguard that privilege" [5] — and the more fundamental violation of the basic right against compelled self-incrimination itself is a legitimate and pivotal distinction was made very clear by the Supreme Court both in *Viven Harris v. New York, supra,* and *Michigan v. Tucker, supra.* In *Harris v. New York,* a statement was taken from a defendant in technical violation of *Miranda.* The Supreme Court held that when only the procedural safeguards of *Miranda* have been violated, the suppression of the statement from the state's case in chief will be mandated in order to deter future police non-compliance with *Miranda.* The Court further held, however, that enough deterrence was obtained by suppressing the statement in chief:

> "Assuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief." 401 U. S., at 225.

The Supreme Court went on to hold that notwithstanding the *Miranda* violation, a statement meeting traditional pre-*Miranda* standards could be offered in rebuttal:

> "It does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards." 401 U. S., at 224.

---

5. *Michigan v. Tucker,* 417 U. S. 433, 446, 94 S. Ct. 2357, 41 L.Ed.2d 182, 192 (1974).

The distinction between a "mere *Miranda*" violation, the product of which may be used in rebuttal or for collateral purposes, and a "primary illegality" of constitutional dimensions under the "fruit of the poisonous tree" doctrine is very clear. The heart of that doctrine was expressed by Justice Holmes in the very case that gave birth to the doctrine, *Silverthorne Lumber Co. v. United States*, 251 U. S. 385, 392, 40 S. Ct. 182, 64 L. Ed. 319 (1920):

> "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all."

In the *Harris v. New York* situation, what is being sanctioned by the Supreme Court is not some remote and derivative use but an actual direct use of the statement itself in rebuttal. The conclusion is ineluctable that a "mere *Miranda*" violation does not trigger the "fruit of the poisonous tree" doctrine.[6]

In dealing with a case not where the *Miranda* warnings were not given but rather where the *Miranda* rights were invoked by the defendant but ignored by the police, the Supreme Court in *Oregon v. Hass, supra*, held that the resulting statement would have to be suppressed in chief but would be usable for other purposes. The Court said at 420 U. S. 722:

> "As in *Harris*, it does not follow from *Miranda* that evidence inadmissible against Hass in the prosecution's case in chief is barred for all

---

**6.** Although in a Fourth Amendment context, this Court, in *Everhart v. State*, 20 Md. App. 71, 315 A. 2d 80, reversed on other grounds 274 Md. 459, anticipated the type of distinction now being drawn, saying at 20 Md. App. 94:

> "We recognize that the whole body of law grown up around the 'fruit of the poisonous tree' doctrine, on the one hand, and the discernible and almost tidal retreat from the exclusionary rule by the Supreme Court, on the other hand, are in essential collision."

As even fresher indications of that retreat, see *Stone v. Powell*, 19 Cr. L. 3333, and *United States v. Janis*, 19 Cr. L. 3323 (both handed down by the Supreme Court on July 6, 1976). And see *United States v. Scios*, 19 Cr. L. 2513 (D.C. Cir.).

purposes, always provided that 'the trustworthiness of the evidence satisfies legal standards.' "

In the present case, the appellant cannot maintain that a derivative use of her statement as a mere lead to a witness will not be permitted where, clearly, a far more direct use of that statement, even if taken in technical violation of *Miranda,* would have been permitted the state in appropriate rebuttal in order to impeach the credibility of the appellant.

Virtually on all fours with the present case is *Michigan v. Tucker, supra.* There, as arguably here, a *Miranda* violation occurred. There, as here, the police conduct would not have offended pre-*Miranda* standards. There, as here, the resulting statement led the police to a witness. There, as here, the defendant sought to bar the use of the witness as the "fruit of the poisonous tree." There, the defendant prevailed on a writ of habeas corpus in the United States District Court for the Eastern District of Michigan, 352 F. Supp. 266 (1972), and again at the United States Court of Appeals for the Sixth Circuit, 480 F. 2d 927 (1973). In reversing the lower federal courts, the Supreme Court distinguished between a basic and traditional infringement of the right against compulsory self-incrimination itself and a "mere *Miranda*" violation, stating the problem at 417 U. S. 439:

> "We will therefore first consider whether the police conduct complained of directly infringed upon respondent's right against compulsory self-incrimination or whether it instead violated only the prophylactic rules developed to protect that right."

The Supreme Court went on to find as a constitutional fact that *Miranda* had been violated but that the undergirding right against compulsory self-incrimination had not:

> "Our determination that the interrogation in this case involved no compulsion sufficient to breach the right against compulsory self-incrimination does

not mean there was not a disregard, albeit an inadvertent disregard, of the procedural rules later established in *Miranda*. The question for decision is how sweeping the judicially imposed consequences of this disregard shall be." 417 U. S., at 445.

The Court then stressed the fundamental difference in quality between the constitutional right itself and its judicially created procedural safeguards:

"The Court recognized that these procedural safeguards were not themselves rights protected by the Constitution but were instead measures to insure that the right against compulsory self-incrimination was protected. As the Court remarked:

'[W]e cannot say that the Constitution necessarily requires adherence to any particular solution for the inherent compulsions of the interrogation process as it is presently conducted.' . . .

The suggested safeguards were not intended to 'create a constitutional straitjacket,' *ibid.*, but rather to provide practical reinforcement for the right against compulsory self-incrimination.

A comparison of the facts in this case with the historical circumstances underlying the privilege against compulsory self-incrimination strongly indicates that the police conduct here did not deprive respondent of his privilege against compulsory self-incrimination as such, but rather failed to make available to him the full measure of procedural safeguards associated with that right since *Miranda*." 417 U. S. at 444.

The Court concluded that the "mere *Miranda*" violation would not trigger the "fruit of the poisonous tree" doctrine and that the derivative use of the statement in the form of the use of the witness thereby discovered would not be barred:

"This Court has also said, in *Wong Sun v. United*

*States* . . . that the 'fruits' of police conduct which actually infringed a defendant's Fourth Amendment rights must be suppressed. But we have already concluded that the police conduct at issue here did not abridge respondent's constitutional privilege against compulsory self-incrimination, but departed only from the prophylactic standards later laid down by this Court in *Miranda* to safeguard that privilege." 417 U. S., at 445-446.

In recent months, both this Court and the Court of Appeals have recognized this pivotal difference between a constitutional violation itself which will trigger the "fruit of the poisonous tree" doctrine and a "mere *Miranda*" violation which will not trigger that doctrine. In *Ryon v. State,* 29 Md. App. 62, 349 A. 2d 393, Chief Judge Orth (now of the Court of Appeals) summarized the distinction at 29 Md. App. 67:

"We know now, in the light of *Tucker,* that failure to give all the *Miranda* warnings does not necessarily abridge the privilege against self-incrimination. . . . [T]he Court in *Miranda* 'recognized that these procedural safeguards were not themselves rights protected by the Constitution but were instead measures to insure that the right against compulsory self-incrimination was protected. . . .' Thus, evidence obtained without full compliance with the *Miranda* dictates is not, for that reason, always to be excluded. So . . . the failure to advise an accused during a custodial interrogation . . . of his right to appointed counsel, did not in the circumstances existent, infringe against the right against compulsory self-incrimination but only violated the prophylactic rules developed to protect that right. Therefore, the use of the testimony of a witness discovered by the police as a result of the accused's statements did not violate any requirements under the Fifth, Sixth and Fourteenth Amendments. . . ."

In *State v. Ryon*, 278 Md. 302, 363 A. 2d 243 (1976), the Court of Appeals did not simply affirm but adopted (with the exception of one footnote not here relevant) the opinion of this Court in *Ryon v. State*.

In *In Re Appeal No. 245, Term 1975*, 29 Md. App. 131, 349 A. 2d 434, Chief Judge Orth again wrote for this Court and considered the obverse side of the coin with which we are dealing in this case. In that case, a piece of physical evidence, a pair of binoculars, was the alleged fruit of the poisonous tree. The allegedly poisonous tree was a statement which yielded up information leading to the discovery of the binoculars. We there held that the statement was inadmissible for two reasons, a *Miranda* violation as such and also a more fundamental violation of the constitutional right against compulsory self-incrimination itself. In a carefully reasoned opinion, Judge Orth pointed out that the latter violation would serve to trigger the "fruit of the poisonous tree" doctrine whereas the "mere *Miranda*" violation would not. He said in pertinent part, at 29 Md. App. 149-150:

> "In both *Harris* and *Tucker*, the misconduct of the police violated only the prophylactic rules developed by *Miranda* to protect the right against self-incrimination. . . . In the instant case, we do not have official action pursued in complete good faith, with the confession rendered inadmissible by the mere inadvertent omission of one of the prophylactic *Miranda* warnings. . . . The rationale of the holdings in *Harris* and *Tucker* does not apply to make admissible the tangible evidence obtained here, any more than it would apply to make admissible evidence derived from a confession not voluntary in the traditional sense."

In the present case, even assuming a violation of *Miranda v. Arizona* which produced some significant lead to Katherine Pope, the violation would be of less than constitutional magnitude and as such would not be a primary illegality within the contemplation of the "fruit of

the poisonous tree" doctrine. *Wong Sun v. United States*, 371 U. S. 471, 83 S. Ct. 407, 9 L.Ed.2d 441 (1963).

## B. *The Antitoxin of Inevitable Discovery*

A second and distinct reason why the appellant cannot prevail on this issue is that even if we were to assume a primary illegality of constitutional dimensions, the inevitable discovery of Katherine Pope by the police would have served to preclude the invocation of the "fruit of the poisonous tree" doctrine.

The full flower of the "fruit of the poisonous tree" doctrine was reached in *Wong Sun v. United States, supra.* The critical language there was to the effect that:

> "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal action of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead *by means sufficiently distinguishable to be purged* of the primary taint.' " 371 U. S., at 487-488.

There are now three recognized limitations on the operation of the "fruit of the poisonous tree" doctrine. Even though some primary illegality has yielded information, the use of such information will not be barred if the state can show one of the following:

(1) Attenuation of the taint — although the primary illegality set a chain of events in motion, the ultimate product is so remote in terms of the chain of causation, with one or more independent intervening causes, that the evidence will not be excluded. See *Washburn v. State*, 19 Md. App. 187, 310 A. 2d 176;

(2) Independent source — although the primary illegality yielded information, the prosecution can show that it already had that information from an independent source. *United States v. Wade*, 388 U. S. 218, 87 S. Ct. 1926, 18

L.Ed.2d 1149 (1967); *Smith and Samuels v. State*, 6 Md. App. 59, 68-69, 250 A. 2d 285; and

(3) Inevitable discovery.

Maguire, *How to Unpoison the Fruit — the Fourth Amendment and the Exclusionary Rule*, 55 J.Crim.L.C. & P.S. 307 (1964).

Judge Learned Hand came to grips with inevitable discovery as early as 1943 in *Somer v. United States*, 138 F. 2d 790 (2d Cir. 1943). An illegal entry into a defendant's apartment and an interrogation there of the defendant's wife assisted agents in "staking out" the premises and arresting the defendant as he returned with contraband. Although holding that there had been a showing of sufficient taint to warrant exclusion at the surface level, Judge Hand further pointed out that the prosecution should be afforded an opportunity on remand to show that:

> "quite independently of what Somer's wife told them, the officers *would have* gone to the street, *have waited* for Somer and *have arrested* him, exactly as they did. If they can satisfy the court of this, so that it appears that they did not need the information, the seizure may have been lawful."

In *People v. Fitzpatrick*, 32 N.Y.2d 499, 346 N.Y.S.2d 793, 300 N.E.2d 139, Chief Judge Stanley Fuld applied the inevitable discovery limitation in New York, reasoning at 346 N.Y.S.2d 797:

> "In line with this reasoning, the courts have held that evidence obtained as a result of information derived from an unlawful search or other illegal police conduct is not inadmissible under the fruit of the poisonous tree doctrine where the normal course of police investigation would, in any case, even absent the illicit conduct, have inevitably led to such evidence. . . . In other words, as one commentator put it, the inevitable discovery factor 'permits the government to remove the taint from otherwise poisoned fruit by establishing that the

unlawful act from which it resulted was not a *sine qua non* of its discovery.' "

In *Wayne v. United States,* 318 F. 2d 205 (D.C. Cir. 1963), Judge Warren Burger (now Chief Justice of the United States) dealt with the police discovery of a corpse made during an illegal entry. He reasoned that the discovery of the body would have been inevitable, in any event:

> "It was inevitable that, even had the police not entered appellant's apartment at that time and in the manner they did, the coroner would sooner or later have . . . obtained the body, and would have conducted the post mortem examination prescribed by law."

One commentator has well explained the rationale underlying the inevitable discovery exception:

> "Although typically any evidence obtained, even indirectly, through the illegal actions of police is inadmissible as 'fruit of the poisonous tree,' where the court finds that the challenged evidence would have been eventually secured through legal means regardless of the improper official conduct, the inevitable discovery exception allows the evidence to be admitted. The doctrine was developed to prevent unjustly granting criminals immunity from prosecution." Comment, *The Inevitable Discovery Exception to the Constitutional Exclusionary Rules,* 74 Col.L.Rev. 88 (1974).

See also LaCount and Girese, *The "Inevitable Discovery" Rule, an Evolving Exception to the Constitutional Exclusionary Rule,* 40 Albany L.Rev. 483 (1976):

> "The principle underlying 'inevitable discovery' is that evidence tainted by illegality will not be suppressed where the prosecution establishes that the evidence would have been discovered by law enforcement officials through the utilization of legal and predictably performed investigatory procedures, and without resort to illegal methods."

In a well-considered dictum for this Court in *Duckett v. State*, 3 Md. App. 563, 577, 240 A. 2d 332, Chief Judge Murphy (now of the Court of Appeals) reasoned:

"We deem it essential, however, to briefly express our views with respect to appellant Smith's argument that as his inculpatory statement was the source which led the police to the open field where the victim was raped, the tangible evidence there found (the victim's shoe and rent receipt, and a piece of cloth) was inadmissible under the 'fruit of the poisonous tree' doctrine. While it may be true that the officers found these items with Smith's assistance, we think their use in evidence at the retrial of the case would not be prohibited by the application of the doctrine upon which appellant Smith places reliance. Without deciding whether that doctrine is applicable in State criminal trials, we believe that the evidence would in any event have been discovered by the police without Smith's assistance since the victim herself could have undoubtedly identified the scene of the crime."

As limitations upon the operation of the "fruit of the poisonous tree" doctrine, the only real difference between "independent source" and "inevitable discovery" is one of time sequence. In the case of the former, there *was* an independent source for the contested information; in the case of the latter, there *was not* an independent source for the information but there *inevitably would have been.*

In terms of inevitable discovery in this case, we entertain no doubt that the police would have learned of Katherine Pope in the course of investigation even if they had not learned of her from the lips of the appellant. On the basis of the physical evidence itself, the books would never have been closed on this case as a routine suicide.

On the morning of her husband's death, the appellant revealed to Mrs. Rose that there was another woman in the picture, with whom she allowed her husband "to sleep" because she "loved him so much." Only nine months before

his death, Douglas Bartram and the appellant had come from Connecticut. At the radio station where Douglas Bartram had worked prior to that move, Katherine Pope had worked also and was still working on the day of Bartram's death. With a mysterious "other woman" lurking in the background of a bizarre homicide, it follows that good police work would have traced the investigative spore to both the late residence and the late place of employment in search of the "other woman."

The discovery becomes even more overwhelmingly inevitable if the first revelation by the appellant to Officer Walbrecher is deemed a constitutionally legitimate lead. The police now have the other woman identified as "Miss Pope" and they have her as having spent the night before Bartram's death in his bed, having left less than an hour before the shooting.

If the discovery of Katherine Pope was not inevitable in time for the State's case in chief, it would have been blindingly apparent in time for rebuttal. By that time, the appellant had spread the full story of Katherine Pope across hundred of pages of the record. The appellant's only tendril of hope was her effort — through her expert witness and his "psychiatric autopsy" — to show that her husband had the capacity to commit suicide. As a predicate for the hypothetical question which was the conclusion of the psychiatric autopsy, the appellant was compelled to bring out her husband's whole troubled sex life, the major share of which revolved about his quasi-polygamous relation with both the appellant and Katherine Pope. But whether the appellant was strategically compelled to reveal the existence of Katherine Pope is beside the point; the only fact that counts is that the appellant *did* reveal the existence of Katherine Pope. As of that moment, Katherine Pope was discovered, even if she had been unknown theretofore.

Independent of all other inevitabilities was the inevitability of discovery generating from within Katherine Pope herself. At the preliminary hearing before Judge MacDaniel, the State's Attorney made the following proffer:

"I said to her, Miss Pope, if the police would not

have called you what would have happened? She said that on that Monday or the Sunday and the Monday that she was down there they discussed, she and Doug Bartram, getting her a job at WFBR because there was an opening. He was to go to work that Monday, check on the opening so that she could move to this job in Baltimore. She was to call him at the station at 3 o'clock in the afternoon and if she would have called and been told that he was dead she said to me that her reaction would have been to call the police herself. Therefore, she would have come to the police's knowledge without the police."

Katherine Pope herself testified that she saw Bartram on virtually every weekend. When she left him on Monday morning, July 2, they were planning to meet in New York City that very Wednesday, two days later. Katherine Pope, moreover, was seriously considering applying for a job with Station WFBR in Baltimore and Bartram was to make inquiries for her in that regard on the very day he was shot. In response to questions put by the Court, Miss Pope stated that she was expecting a phone call from Bartram by 3 p.m. on the day of his death, that if she had not been called by 3:30 p.m., she would have placed a call to him at WFBR, and that if she had been told of his death, she herself "would have called the police." As events turned out, the Baltimore County police had contacted the Hamden, Connecticut police and they, in turn, had contacted Miss Pope well before 3 p.m. The discovery of this witness was inevitable.

The very notion that a witness who could aid significantly in the search for truth in a murder case should be forever lost to the fact finder because a constable somehow inadvertently blundered cuts across the grain of any sensible jurisprudence. *Michigan v. Tucker, supra,* dealt with precisely this sort of imbalance, at 417 U. S. 450-451:

"[W]hen balancing the interests involved, we must weigh the strong interest under any system of justice of making available to the trier of fact all

concededly relevant and trustworthy evidence which either party seeks to adduce. . . . Here respondent's own statement, which might have helped the prosecution show respondent's guilty conscience at trial, had already been excised from the prosecution's case pursuant to this Court's *Johnson* decision. To extend the excision further under the circumstances of this case and exclude relevant testimony of a third-party witness would require far more persuasive arguments than those advanced by respondent."

## C. *Error, If Any, Would Be Harmless*

For essentially the same reasons already discussed in Section 1B *infra*, any hypothesized error involving the use of Katherine Pope as a witness would be, in our judgment, harmless beyond a reasonable doubt, even if *Miranda* had been violated, even if a *Miranda* violation would trigger the "fruit of the poisonous tree" doctrine and even if inevitable discovery would not serve as an effective antitoxin to that doctrine.

Where the physical facts of the shooting conclusively established a homicidal agency, a suggestion of a motive became, in relative terms, surplusage.

More significantly, however, the testimony of the appellant about Katherine Pope made the testimony of Katherine Pope herself merely surplusage. As to the long and sordid triangular relationship, Katherine Pope was somewhat reticent. The appellant poured out the full story in lurid detail. Katherine Pope, even on this relatively peripheral issue, added nothing of moment to the testimony of the appellant herself.

### 3. *The Mullaney v. Wilbur Issue*

The appellant is straining to inject *Mullaney v. Wilbur*, 421 U. S. 684, 95 S. Ct. 1881, 44 L.Ed.2d 508 (1975), into this case. Although the leprous phrase "presumed to be murder in the second degree" does once, in passing, raise its frightening head, it does so in an innocuous context. It is

effectively quarantined deep within an extended discussion of first-degree murder. Even assuming a jury waiting attentively to be electrified by the galvanic word "presumed," the only operative effect could have been to hold first-degree murder down to second degree by stressing the heavy burden upon the State to move upward:

"First degree murder is defined generally in Article 27, Section 407 as: 'All murder which shall be perpetrated by means of poison, or lying in wait, or by any kind of willful, deliberate and premeditated killing.' *Homicide is presumed to be murder in the second degree, and the burden is on the State to show that the killing was willful, deliberate, and premeditated if the crime is to be elevated to first degree murder.* It is not necessary that deliberation and premeditation should be conceived or should have existed for any particular length of time before the killing. The existence of these elements must be judged from the facts of the particular case. If the killing is not the instant effect of impulse, if there is hesitation or doubt to be overcome and choice made as a result of thought, however short the struggle between the intent and the act, the crime is sufficient to be characterized as deliberate and premeditated murder. A killing that is willful, deliberate, and premeditated is murder in the first degree.

The terms willful, deliberate, and premeditated are defined as follows: Willful. There must be a specific purpose and design to kill. Deliberate. There must be a full and conscious knowledge of the purpose of doing so. Premeditated. The design must have preceded the killing by time sufficient in length to deliberate.

In order to justify conviction of murder in the first degree as thus defined, the Jury must find the actual intent, the fully formed purpose to kill, with so much time for deliberation and premeditation as to convince you this purpose is not the immediate

offspring of rashness and impetuous temper and that the mind has become fully conscious of its own design to kill." (Emphasis supplied)

There was no mention of any burden being upon the appellant to do anything.

Mitigation, moreover, was not a legitimate jury issue in this case. *Evans v. State*, 28 Md. App. 640, 349 A. 2d 300, aff'd. *State v. Evans*, 278 Md. 197, 362 A. 2d 629 (1976). In the circumstances of this case, only the appellant could have injected evidence as to an intentional but hot-blooded killing. She, however, stoutly maintained that the killing was suicidal.

Even a willingness to disbelieve the appellant about not pulling the trigger while believing her as to a long history of tribulations and abuses could not supply legally adequate provocation even by inference. It is hornbook law that if one spouse discovers another in an unexpected act of adultery, a killing of spouse or paramour in hot-blooded fury may lower the blameworthiness from the murder level to the manslaughter level.

The blood, however, must indeed be hot and, generally speaking, only the hot-blooded killer can attest to that. By an objective standard, moreover, the time frame must be close enough so that an average and reasonable man would not have had an adequate "cooling period" for the first fury to abate. The appellant here had spent the entire last night on the living room sofa while her husband and his mistress were in the master bedroom. The appellant was able to wait for the mistress to get up and go in the morning. The appellant was able to go in and lie down with her husband and give him an affectionate hug. The appellant was able to stage an apparent suicide. Within the context of intentional homicide, all of her actions point to a long history of resentment culminating in a considered although desperate act rather than to a sudden and spontaneous fury acting through her.

Furthermore, in terms of the legal adequacy of the provocation, the discovery of adultery must be sudden and

unexpected. The appellant here had been a regular eyewitness, an aider and abettor (albeit a reluctant one) and indeed a bed partner to the adultery on a weekly basis for the better part of several years. On at least two occasions, the entire threesome had engaged in some sort of simultaneous sexual experience. The victim had sought his wife's permission to have the affair and had received that permission. The appellant and her husband had, moreover, on at least several occasions over an extended period of time, been "swingers." They would meet, by appointment, with other "swinging" married couples and would exchange spouses for a night of sex. Although Bartram was the moving party, the appellant voluntarily participated and did her duty on each occasion. The appellant and her husband placed classified ads in "swingers'" magazines, advertising their availability, sometimes stressing his attributes and sometimes stressing hers.

All of this is simply not what is contemplated by the law of mitigation when it looks to the hot blood or uncontrollable fury of a betrayed spouse suddenly catching a partner in an unanticipated act of infidelity. See generally LaFave and Scott, *Criminal Law*, Ch. 7, "Voluntary Manslaughter," Sect. 76, "Heat-of-Passion Voluntary Manslaughter," pp. 575-582; Perkins, *Criminal Law* (2d Ed. 1969), "Manslaughter — The Rule of Provocation," pp. 64-69; Clark and Marshall, *Law of Crimes* (6th Ed., Wingersky Revision, 1958), Sect. 10.11, "Voluntary Manslaughter," pp. 626-634.

The law recognizes the human frailty of sudden fury. For the long-suffering spouse, the way out of the unbearable predicament must be the divorce court and not a bullet.[7]

---

7. *De facto*, the appellant actually received the benefit of a manslaughter-type sentence. Although logically facing a choice between first-degree murder or nothing, the jury, out of obvious compassion, returned a second-degree verdict. In a further act of articulated compassion, the sentencing judge eschewed a second-degree level of sentencing and gave the appellant ten years, within the manslaughter range. The mitigation of punishment which the appellant ostensibly seeks by virtue of this contention, she, in real effect, got.

Indeed, the essence and *raison d'etre* of the crime of voluntary manslaughter is the attempt, by the formal avenue of substantive law, to recognize the very type of extenuation which was actually recognized in

With respect to this contention dealing with jury instructions on manslaughter, there was neither error nor a sufficient jury issue to make an error, even if there has been one, material.

### 4. The Grand Jury Issue

The appellant's final contention smacks more of rhetoric than of substance. At issue is the propriety of the second grand jury indictment in this case.

The Grand Jury of Baltimore County originally considered this case and handed down a first indictment on April 9, 1974. We surmise from the record that it was not then the customary practice to have a reporter making a transcript of testimony before the Grand Jury. Because of the complex nature of the case, the State's Attorney's Office departed from the norm and ordered a transcript. The Deputy State's Attorney, Benjamin Bronstein, told the court, "The first time was entirely different from what we normally would do in front of a grand jury because of the technical nature of this particular case." Because of the technical nature of the case, the norm was departed from in yet a second respect. It appears that three witnesses were brought into the grand jury at one time. While one testified, the other two stood aside. The second then stepped forth to give his testimony and subsequently so did the third. Recognizing an at least

---

this case by more informal and discretionary avenues. As LaFave and Scott, *Criminal Law*, points out, at 582:

"*Rationale of Voluntary Manslaughter*

Why is it that there exists such a crime as voluntary manslaughter to aid one who kills when provoked into a passion, yet there is no crime like, say, voluntary theft or voluntary mayhem to aid others who, reasonably provoked into a passion, steal from or maim their tormentors? The answer is historical. With most crimes other than murder the English court came to have discretion as to the punishment and so could take extenuating circumstances into account in the sentencing process; but with murder the penalty remained fixed at death, without the possibility of making any allowance for the extenuating fact that the victim provoked the defendant into a reasonable passion. The rule of law that provocation may, within narrow bounds, reduce murder to manslaughter, represents an attempt by the courts to reconcile the preservation of the fixed penalty for murder with a limited concession to natural human weakness.' "

arguable violation of *Coblentz v. State*, 164 Md. 558, 166 A. 45 (1933),[8] the State nolle prossed the first indictment and presented the case afresh to a second grand jury made up of different persons.

Contrary to the suggestions made by the appellant, there is no suggestion in the record that the State, for some undefined purpose, deliberately and oppressively flouted the law respecting grand jury secrecy. At worst, it blundered and it subsequently took corrective action to repair the possible defect. If there was an unduly heavy concentration of witnesses before the first grand jury, two dangers loomed.

One involved the possible compromise of the secrecy of the grand jury proceedings. This would be of no moment to the appellant since the law is clear that grand jury secrecy is required not for the protection of a person ultimately indicted but rather for the protection of 1) the grand jury itself, 2) the witnesses before a grand jury and 3) persons who come under suspicion but are ultimately not indicted. 8 Wigmore, *The Law of Evidence*, "Grand Jury," pp. 728-744. The appellant fell into none of those categories.

The second danger involved the possibly undue influence which unauthorized persons, or an unauthorized accumulation of authorized persons, may have upon the grand jurors themselves in their deliberations. Whatever danger may have here inhered was cured by the nolle pros of the first indictment.

The appellant's argument is that the second grand jury indictment simply perpetuated the impropriety of the first because on the second occasion, the Deputy State's Attorney and/or one police witness summarized the State's case before the second grand jury. The point is not well taken. The arguable defect in the first proceeding dealt only with

---

8. *Coblentz* actually dealt with the presence in the grand jury room of a specially appointed prosecutor, who was present not as a witness but as a legal advisor. The court there held that his commission as a special prosecutor did not empower him to attend the grand jury as its advisor. Whether the *Coblentz* holding would extend to the present situation where the witnesses were all legitimate consecutively but may arguably not have been legitimate concurrently is not before us and we do not decide it. The State assumed that it had made a mistake in this regard and, in the exercise of caution, obtained a new indictment.

the possible unauthorized presence of too many witnesses at the same time and not with the quality of the evidence presented. At the second proceeding, there was no such undue concentration of witnesses.

The appellant makes the unsupported claim that because a fuller treatment of the case, with more live witnesses, was presented to the first grand jury, such full and detailed treatment is of necessity mandated before the second grand jury. We know of no such law. We look to the *de novo* proceeding before the second grand jury as something written upon a clean slate. Its adequacy will rise or fall in a vacuum. That it was the second attempt at a valid indictment instead of the first attempt is of no moment.

In looking at the second indictment, we are looking at the quality of the evidence presented before the grand jury and not at the persons present in the grand jury room. The only attack that could be made upon that quality is that it was hearsay presented through the conduit of the prosecutor or of one of the investigators rather than being the direct testimony of eyewitnesses.

A grand jury indictment will not be dismissed because the grand jury acted upon the basis of hearsay evidence. This is not because the courts of the land either approve or disapprove of the use of hearsay by a grand jury. It is rather because it is not the business of the courts of the land to concern themselves with the quality of the evidence upon which a grand jury acts.

Squarely on point is the decision of the Supreme Court in *Costello v. United States*, 350 U. S. 359, 76 S. Ct. 406, 100 L. Ed. 397 (1956). In that case, the presentation of the government's case upon the merits consisted of 144 witnesses and 368 exhibits. It was learned that at the grand jury level, all of the government's case had been presented by three investigating officers who "had no first-hand knowledge of the transactions upon which their computations were based." The only evidence before the grand jury was hearsay. In declining to upset that indictment, the Supreme Court held that "neither the Fifth Amendment nor any other constitutional provisions

prescribes the kind of evidence upon which grand juries must act." 350 U. S., at 362. The Supreme Court held squarely that the adequacy of a grand jury action is to be tested not by a motion to dismiss but by the ultimate trial on the merits:

> "If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. . . . An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more." 350 U. S., at 363.

The law of this State is not dissimilar. In dealing not with mere hearsay evidence but with evidence stemming from possibly illegal wiretaps, this Court reaffirmed in *Hopkins v. State,* 19 Md. App. 414, 311 A. 2d 483, that the courts do not inquire into the quality or constitutional propriety of the evidence upon which a grand jury acts. Chief Judge Gilbert there held for us, at 19 Md. App. 426:

> "Appellant argues that he was entitled to the grand jury's records in order that he might show that the illegal tapes were made known to the grand jury and 'might have tainted the grand jury's indictment.' Detective Donnally stated at the pretrial hearing that he did not 'remember' mentioning the tapes before the grand jury. Even if the grand jury had been informed of the illegal tapes, the hearing judge would still have been correct in refusing to furnish the grand jury minutes to the accused. *The grand jury is an inquisitional and accusatory body. It does not determine the guilt or innocence of the accused as that decision is vested in the petit jury or court, if there be a non-jury trial. That an indictment is founded on tainted evidence is no ground for*

*dismissal as '. . . [N]ormally, there is no limitation on the character of evidence that may be presented to a grand jury. . . .' Gelbard v. United States,* 408 U. S. 41, 60, 92 S. Ct. 2357, 2367, 33 L.Ed.2d 179, 193 (1972); *United States v. Blue,* 384 U. S. 251, 86 S. Ct. 1416, 16 L.Ed.2d 510 (1966). The rules of evidence are not applicable to grand jury proceedings. Of course, a competent and conscientious prosecutor would be most reluctant to seek an indictment based wholly on tainted evidence knowing that such evidence could not be used at trial." (Emphasis supplied)

And see *Silbert v. State,* 12 Md. App. 516, 280 A. 2d 55; *Maloney and Keller v. State,* 17 Md. App. 609, 304 A. 2d 260, and *State v. Aquilla,* 18 Md. App. 487, 309 A. 2d 44.

The false premise of the appellant as she argued this contention was the drawing of an easy but erroneous analogy between the institution of the grand jury and the institution of the petit jury. The two institutions have nothing in common beyond the name "jury." "A grand jury proceeding is not an adversary hearing in which the guilt or innocence of the accused is adjudicated. Rather, it is an ex parte investigation." *United States v. Calandra,* 414 U. S. 338, 343, 94 S. Ct. 613, 38 L.Ed.2d 561, 569 (1974). The grand jury is not a judicial arm but a prosecutorial arm. Instituted by Henry II at the Assize of Clarendon in 1166, it is far older in fulfilling the charging function than is the office of the prosecutor.

As the Supreme Court pointed out in *Blair v. United States,* 250 U. S. 273, 282, 39 S. Ct. 468, 63 L. Ed. 979 (1919):

"It is a grand inquest, a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime."

That we do not see anything improper about offering

hearsay evidence to the grand jury is beside the point. What is to the point is that it is not within the power of this Court, or of courts generally, to interfere with the decision-making process of the grand jury or to inquire into the sources of, or sufficiency of, the knowledge upon which they base their decisions. As the Court of Appeals held as early as 1933 in *Coblentz v. State*, 164 Md. 558, 166 A. 45:

> "The grand jury is an accusing body, and not a judicial tribunal; and it acts upon knowledge possessed by its members from any source, whether from witnesses brought before it, or from information gained before its sessions. 'In this state they have plenary inquisitorial powers, and may lawfully themselves, and upon their own motion, originate charges against offenders, though no preliminary proceedings have been had before a magistrate, and though neither the court nor the state's attorney has laid the matter before them."

Writing to a similar effect was the Supreme Court in *United States v. Calandra, supra,* at 414 U. S. 343, 344-345:

> "Traditionally the grand jury has been accorded wide latitude to inquire into violations of criminal law. No judge presides to monitor its proceedings. It deliberates in secret and may determine alone the course of its inquiry.
>
> . . .
>
> The grand jury's sources of information are widely drawn, and the validity of an indictment is not affected by the character of the evidence considered. Thus, an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence . . . or even on the basis of information obtained in violation of a defendant's Fifth Amendment privilege against self-incrimination."

See also *Lawn v. United States*, 355 U. S. 339, 78 S. Ct. 311, 2

L.Ed.2d 321 (1958), and *Holt v. United States,* 218 U. S. 245, 31 S. Ct. 2, 54 L. Ed. 1021 (1910).

The appellant complains that her indictment may have come at the hands of a grand jury that was not fair and impartial. We know of no such requirement. A petit jury must, of course, be unbiased and impartial. Elaborate voir dire procedures exist to root out possible bias. Partiality would be grounds for a challenge for cause. No such screening devices are applicable to a grand jury. There is no more requirement that a grand jury be impartial than that a prosecutor be impartial or that a policeman be impartial. They must all play within the rules. The acid test of their actions, however, will come when the petit jury renders its verdict upon the charges they have brought. As Chief Judge Bond squarely held in *Coblentz v. State, supra,* at 164 Md. 570:

> "A second objection advanced in the plea was that nine members of the grand jury were disqualified from serving in the investigation and from finding this particular indictment because they had been subject to losses as depositors in the Central Trust Company, or in other depositories which had been merged with that company, and were embittered against the defendant; and because the foreman, one of those depositors, had publicly declared his hostility to the defendant and charged him with fraud. This objection we find insufficient to support the plea. . . . we find no ground for imposing a requirement that they must be unprejudiced, as the objection demands. On the contrary, such a requirement would seem inconsistent with their freedom to accuse upon their own knowledge, for persons who come with knowledge sufficient to serve as a basis of indictment are likely to come with the conclusion and prejudice to which that knowledge leads. They must act upon their own convictions, after conferring secretly and without any interference;

but they are not required to come without any prejudice."

In *Hopkins v. State*, 24 Md. App. 53, 329 A. 2d 738, we held that the fact that a grand juror was a police officer did not disqualify him from grand jury service. The case law there marshaled by Chief Judge Gilbert sharply contrasted the stark reality of the law as it is with the prevailing mythology of the law as many defendants would like it to be:

"It has been held that a person is not disqualified to serve as a grand juror on the ground that: (a) he was the prosecutor of the case, *U.S. v. Williams*, 28 F. Cas. 666 (No. 16,716) (C.C.D. Minn. 1871); (b) he was a relative of the person the accused was alleged to have injured, *Collins v. State*, 3 Ala. App. 64, 58 So. 80 (1912); (c) the complaining witness, *Holmes v. State*, 160 Ark. 218, 254 S. W. 470 (1923); (d) the son-in-law of the murder victim, *Oglesby v. State*, 83 Fla. 123, 90 So. 825 (1922); (e) the father of a rape case prosecutrix, *Zell v. State*, 15 Ohio App. 446, 32 Ohio C. A. 385 (1922); (f) the committing magistrate, *State v. Chairs*, 9 Baxt. (Tenn.) 196 (1877); (g) a member of a petit jury before whom perjury was alleged to have been committed, *State v. Wilcox*, 104 N. C. 847, 10 S. E. 453 (1889); (h) a special police officer, *Commonwealth v. Hayden*, 163 Mass. 453 (1895); (i) a member of an organization the object of which was to detect crime, *Musick v. The People*, 40 Ill. 268 (1866); (j) that he had previously issued a warrant for and expressed an opinion as to the guilt of the accused, *United States v. Belvin*, 46 F. 381 (1891); (k) a deputy sheriff, *Owens v. The State*, 25 Tex. App. 552 (1888)." 24 Md. App., at 64.

The propriety and the sufficiency of the grand jury indictment now in issue were put to the ultimate test of the petit jury's verdict; they were found to be not wanting.

\* \* \*

The evidence amply supported the verdict that the appellant killed her husband. Because of the series of travails which had brought this essentially non-criminal woman to so desperate a strait, the executors of the law, in their combined compassion, held the sentence to one of ten years. In a lengthy and complex jury trial, the appellant received a brilliant and indefatigable defense. The prosecution was equally astute. At the hands of an eminently impartial and able judge, the appellant received a fair trial. No more can be asked of a criminal justice system. A reversal would be a travesty.

*Judgments affirmed; costs to be paid by appellant.*